THOMAS C. HOWARD, plaintiff in error, *vs.* SAMUEL A. DURAND, defendant in error.

1. A Court of equity will enforce obedience to its orders by attachment.
2. The action of the Superior Courts in punishing parties for contempt, will not be controlled, except they abuse their discretion.
3. In some cases the punishment of a party for a contempt, is a remedial proceeding to which the opposite party is entitled ; though it may not be necessary for the vindication of the authority of the Court.
4. In such a case, if the Court below fail to give the party his rights, this Court will correct the error, and grant the party that relief to which he is entitled.
5. Where a party consents to the violation of an injunction granted at his instance, and takes upon himself the management of the case, he cannot subsequently have the opposite party punished for such violation.
6. A Court of equity will not lend its punitive powers to one party, to coerce the opposite party into the making of new stipulations to which he had never agreed ; nor under pretence of punishing for breach of an injunction, attempt to enforce a contract made subsequent to its sanction.
7. Equity will enforce the rights of parties ; and those who invoke its aid, should not by contract render nugatory its processes.

Motion to attach for violating injunction, in Fulton Superior Court. Decided by Judge WARNER. April Term, 1867.

This bill was filed by Thomas C. Howard against Frederick A. Williams and John C. McLean, for account and settlement, and against Samuel A. Durand for account, settlement and injunction.

The facts as set forth in the bill are substantially as follows:

In March, 1857, or 1858, complainant, John S. Williams,

John H. Lovejoy and H. L. Currier, composed "The Atlanta Spoke Company," manufacturing spokes and hubs for carriages. They were to furnish equally the necessary capital, and equally share the profits and losses of the business. John S. Williams and Frederick A. Williams were at the same time, partners under the style of F. A. & J. S. Williams, manufacturing furniture, and owned valuable water power near Atlanta.

Before any work was done by "The Atlanta Spoke Company," Lovejoy sold his interest therein to F. A. Williams, and said Currier sold his to F. A. & J. S. Williams.

Complainant consented to these changes, and he and said Frederick A. and John S. agreed to continue under said first name, they owning one half and complainant the other half, with the privilege to said Spoke Company of using said water power as long as said Spoke Company desired it, paying F. A. & J. S. Williams for such use, one dollar per day.

The Atlanta Spoke Company thus constituted, bought much machinery, consisting of mortising machines, lathes, pulleys, belts, etc., suitable for said work, and a patent spoke lathe, known as the Burn lathe, with the right to sell said lathe in Alabama, Mississippi, Texas, Louisiana, Georgia and other States.

Said articles cost $12,000, and buildings, etc. to operate the same cost over $2,000, one-half of which sums complainant paid.

Complainant having confidence in said Frederick A. and John S. allowed them the exclusive management of the business, and they so managed it till John S. died. This was some time in 1858. Frederick A. took the interests and rights of John S., as survivor of F. A. & J. S. Williams, and he and John C. McLean, (who had bought one-half of F. A. Williams's interest,) and complainant continued the business upon same terms and under same name, till about 1st January, 1861. Said Williams and McLean exclusively managed the business. They sold $5,000 worth of spokes and hubs, the cost of manufacturing them not exceeding two thirds of that amount. They sold several of the Burn lathes,

with the rights and privileges attached thereto, at a profit of $4,000. Complainant is entitled to one-half of said profits.

Their employees went into the army and the work stopped. There was then on the premises finished and unfinished hubs and spokes, worth $6,000 or other large sum, a rim binder invented by E. L. Morton, worth $500. By contract, Morton was to patent this, and the Company had a right to use it as long as it wished. That use is worth $1,000 per year. The said water power was worth to the Company $1,000 per year. All the machinery and work of the Company was on the premises.

In April, 1861, F. A. Williams became, from disease, unable to attend to business. On the 21st August, 1862, Williams and McLean sold one-third interest in all the lands and improvements, with the water power, mills, machinery, engines, lathes, tools, patterns, stock of all kinds on the premises or at the mills, finished and unfinished work in the shops, to Samuel A. Durand, and then and there formed a partnership with him, in the business of manufacturing furniture.

In September, 1862, Durand bought out McLean's interest in this firm, and afterwards bought out Williams's interest therein. Complainant had no notice of the sales.

Although no intention of defrauding complainant in this trade, is charged to Williams and McLean, yet they put Durand into possession of all the property of said Spoke Company, which was in said mills, shops and other houses on said land.

Durand bought with notice of complainant's rights. Complainant has offered to furnish one-half of the necessary capital, but Durand denies him any rights in the premises, and is making spokes and hubs on his own account, and getting large profits by contracts for the same.

Complainant has offered to sell out to Durand or buy him out. He has offered to sell the whole and divide with Durand. Durand will do neither, nor will he submit their claims to arbitration.

Machinery being very scarce, this is now worth double the

original cost; it is encumbered by no debt, and with sufficient hands, fifty thousand dollars *per annum* profits could be realized by making spokes and hubs, so great is the demand for them by the Confederate States and others.

Durand is realizing these profits, and refuses to allow complainant to participate therein, and is wearing out said machinery and consuming said material.

After the other prayers usual to such a bill, is a prayer for injunction against Durand, enjoining him from selling any of the finished or unfinished material and work on hand belonging to said Spoke Company, from running, using, selling or disposing of any of the machinery, mortising machines, pulleys, belts, patterns, rims, lathes, etc., belonging to the said Company, until further order.

The injunction was granted by Judge O. A. Bull, 9th January, 1863. Injunction issued, and Durand was served 16th January, 1863. There was a return of *non est inventus* as to the other defendants. Durand has not answered the bill.

At April Term, 1866, it was represented to the Court, that Durand had violated said injunction by selling and otherwise disposing of all the finished and unfinished work and materials of said Company, with its machinery, heretofore enumerated.

Thereupon he was ordered to show cause why he should not be committed for contempt.

At that term, Durand, for cause, denied that he had violated said injunction, that he had sold or disposed of any of said property; that he had used, sold or disposed of the machinery, and stated that a short time after the service of said injunction on him, his shops, machinery, water-power, etc., including the machinery mentioned in said *rule nisi*, was seized and impressed by Major Norman W. Smith, Chief Inspector of Field Transportation, of the Confederate States Government, and was used by him up to a period within a few days of the fall of Atlanta, when said machinery was carried or sent by the agents of the Government, to the city of Augusta for safety and to prevent it from falling into the hands of the enemy; and afterwards when Augusta was threatened, it was removed

to Greenville, South Carolina, where it still is, so far as he knows, subject to the decision and decree of the Court.

In September, 1866, Durand, "by way of amendment to his said answer," further answered, that shortly after service of the injunction, and after he had stopped his operations in obedience thereto, complainant and he commenced negotiations for a settlement of their said controversy; that he, as he believed, had purchased all of said machinery, etc., from F. A. Williams and McLean, in a trade for their land, water-power and manufacturing establishment, to which the machinery of the Atlanta Spoke Company was attached, without any reservation having been made.

Defendant, in reply to a proposition made by complainant to purchase said machinery, stock, etc., on the 11th February, 1863, wrote as follows:

"Colonel T. C. HOWARD:—Your proposition to purchase the machinery and stock heretofore belonging to the Atlanta Wheel and Spoke Company and now in my possession, (one-half of which is claimed by you,) is hereby accepted; the price is understood to be six thousand dollars, to be paid by you to me and (upon) delivery of the property, said property to be delivered whenever a certain contract for six hundred wheels, which are now being completed, shall be ready for delivery.

"I understand that you are to have the benefit of all the net profits arising from said wheels, which profits are to be deducted from the six thousand dollars you are to pay me for the property.

"I further understand that Captain E. L. Morton is to select out the property sold, and to assist in preparing it for removal from my premises; also that I yield my claim to any hand or hands now in my employ, whom you may wish to employ for any purpose, and work for you myself at just compensation.

"I further understand and hereby agree, that in case of failure on my part to carry out the sale and delivery of the property above-mentioned, I forfeit and pay over to you the sum of ten thousand dollars as fixed and liquidated damages. On the other hand, should you fail or decline taking the ma-

chinery, etc., and tender me the money as above, within ten days after I shall have announced ready to receive it and deliver the property sold, you are to renounce all claim or claims whatever to said property, and yield the same to my benefit.                                    SAMUEL A. DURAND.

*Test.*  J. T. LEWIS.

"If the foregoing recital of our trade is in accordance with your understanding from what Captain Morton verbally communicated to you, then endorse below, the words 'Ratified and agreed to, this 11th February, 1863, in presence of.'    Let Captain Morton be the custodian of this paper till the trade is either consummated or abandoned.

S. A. DURAND."

Complainant, in presence of said Lewis, wrote on said letter, " Ratified and agreed to, this 11th February, 1863," and signed the same.

Durand says this agreement settled the injunction to all intents and purposes, and remitted the parties to their respective rights.    He urges that this view is proven by the fact that in March, 1866, Howard brought suit against him on said paper, in the Inferior Court of said county, for ten thousand dollars liquidated damages, as appears by exhibited copy of the declaration.

He therefore insists that he cannot be liable for any violation of the injunction after 11th February, 1863.    He says he has not violated said injunction, the same having been virtually dissolved, and said case settled by said contract; and he feels confident that complainant so thought and understood; which confidence, he says, is strengthened by no step being taken from that time till April, 1866, to move in this case.

At April Term, 1867, said motion being in order and the parties ready for trial, the following evidence was submitted:

Affidavit of complainant, (sworn to in open Court, April 18th, 1866,) stating that Durand had violated the injunction by renting out the machinery and privileges of the Atlanta Spoke Company, to one Major Hawes, in 1863, who used it for the Confederate States Government; that Durand also sold and otherwise disposed of a great deal of the material and

work, finished and unfinished, on hand when the injunction was granted; that he sold spokes and hubs to Edward Gardner of said county, and offered to let him have as many as he wished; that he sold spokes and hubs to Mack, a negro; that he sold or gave to one Winton, of said county, spokes and hubs, and a rim or wood binder which was very valuable; that he has sold, given away or otherwise disposed of, or allowed to be wasted or destroyed, the whole of the balance of the machinery, tools, material and work on hand when the injunction was granted; that these sales were to persons and for sums unknown to complainant, and without his consent, and against his wish:

Affidavit of EDWARD GARDNER filed in office, April Term, 1866, which stated that on or about 15th April, 1863, he purchased from Durand, spokes, hubs and rims, which were known at the time of the purchase as a part of the stock of the Atlanta Spoke Company; that he is certain as to the spokes and hubs, and is almost certain he bought rims also, that he knows of his own knowledge that said articles belonged to the Atlanta Spoke Company, and that Durand told him they were of the old stock, and had been seasoning three years, and that he could get as many as he might need thereafter, as he Durand, had thousands of dollars worth of well seasoned stock on hand, that he paid Durand therefor a stirrup machine worth $200, that he is a carriage-maker and knows what he says, and that Durand broke several spokes to show him that they were seasoned:

Affidavit of G. B. TEDDER stated, that he was in Durand's employment in the latter months of 1863, that he heard Durand say that he had been trying some time to rent his property known as Peachtree Mills, to the Confederate Government; that he did rent said property, including the hub and spoke and rim machinery, as deponent thinks and believes, to Captain Green and Major Hawes, and from what he heard Durand and said Green and Hawes say in repeated conversations, he has not the least belief that said property was seized; that a large and valuable lot of manufactured stuff was on hand, worth, in his opinion, several thousand dollars; that Durand

sold, and he sold, by Durand's request, hubs and spokes made a considerable time before the sales :

The answers of WM. F. HAWES to interrogatories, substantially to this effect.   He had in his possession the contract with Major Norman W. Smith, Chief Inspector of Field Transportation for District, No. 2, C. S. A., as all contracts had to be made in his name.   Captain John W. Green, Inspector of Transportation on the field, received a letter from Durand about the first of February, 1864, proposing to rent a manufacturing establishment on Peachtree Creek, and I was ordered to inspect the property as I had the locating of repair shops of the army.   I immediately went with Captain Green to inspect it, and agreed to the use of all the machine shops and machinery, all of take it on Durand's proposition, which was : I was to have the surrounding houses, (except Durand's dwelling) the arable land on same side of creek as was his dwelling, for $2500 *per annum*.   The price of timber, lumber, &c., was mentioned in the contract.

The contract was sent to Augusta for Major N. W. Smith to sign.   After I had possession and had been working the shops some two weeks, Durand refused to sign the contract as made and sent to Smith on his proposition.   I telegraphed Smith and he came to Atlanta that night, about the first of March, 1864.   During that month I received an order from Captain Green to impress the property, but Durand had signed the contract before I notified him that I had the order.

The contract, or a true copy which I had, is lost.   I bought at the shops, under that contract, 44 gallons lard oil, 108 pounds paint, 10,000 feet seasoned oak lumber, 8,000 large wagon spokes, 12,000 small spokes, 1200 wagon felloes, 395 large and 200 small wagon hubs, and 300 pounds band iron, 100 pounds Swede iron, 500 ditto, 12 wheelbarrows, 15,000 brick, 15 pounds babbit metal, 300 pine trees at the works. I rented the property about the 1st of February, 1864, and left in July, 1864.

I do not know the value of the material on hand.   All the lumber, such as hubs, spokes, bedstead and chair furniture,

23

was destroyed by the enemy and citizens.   Durand took away nothing except the finished chairs.   Durand let Porter have the machinery out of the old flour-mill between the saw-mill and machine shops, for a distillery, in which he and Porter were partners.

By orders from my superiors, in July, 1864, I moved the machinery first to Greensboro, then to Augusta, and part afterwards to Washington, and part to Greenville, South Carolina. I did not consult Durand about moving it.   I paid him $1,250 I think, as rent.   Durand told me after he had signed the contract that he knew I had an order to impress, and he thought it best to settle it in a friendly way.   He and Porter wished to erect a distillery in one of the shops which I had rented, and I refused; this was Durand's reason for refusing to sign the contract.

GEORGE H. SULLIVAN, in answer to interrogatories, said substantially, that about the 1st of November, 1865, Durand showed him a list of machinery (which he said had been at Williams' Mills) for manufacturing hubs, spokes and rims, and they entered into a contract of partnership to make hubs, spokes, &c., in connection with the cabinet business, by which I was to control the machinery for five years from 1st of January, 1866, &c. He sold me half of the material on hand which consisted of about 8,000 spokes, some artillery wheels and chair stuff, and he sold me a quantity of wagon, buggy and artillery timber.   He sold to me, for a term of five years, a complete set of spoke and hub machinery, representing that it had successfully operated at Williams' Mills till the Federal troops threatened the place, when it was refugeed away. Shortly after this, he told me he had paid a man $200 to go for it and deliver it to me.

In answer to cross-interrogatories, he stated that he had no interest in the suit; that he had had no difficulty with Durand only what had grown out of suits by Durand against him, and that he had no personal enmity whatever against Durand.

Wm. G. Harris' interrogatories were to this effect:

I went to Williams' Mills 1st September, 1865.   There was no machinery of the Atlanta Spoke Company there then,

but there were about 6,000 spokes, some of them slightly damaged, and some artillery wheels, no rims nor hubs.  By arrangement with Durand, I sold all the material, and gave him one-third of the proceeds.  I sold one hundred spokes for $7, 5,000 spokes to A. T. Fenney at 3½ cents each.  Durand got $40 for four wheels sold by himself.  Durand sold me two-thirds of the machinery of the establishment and wished me to go for it.

Durand afterward sold this same machinery to George H. Sullivan without my knowledge or consent.   Durand said the machinery was ample for making buggy spokes, rims and hubs, and wished me to get workmen and to do a carriage-making business.   This all occurred about September, 1865.

Lewis J. Parr testified by interrogatories, that he knew the property of the Atlanta Spoke Co., at Williams' Mills, on Peachtree Creek.  It consisted of two spoke machines, two polishing belts, augurs, chisels and other tools, one lathe and mortising machine, and one machine for building rims for buggies, wagons, &c., with shafting, pullies, belting, &c., to drive the machinery, one steamer for steaming rims, some 12,000 or 15,000 unfinished spokes of different sizes, about 30,000 finished spokes of different sizes, for buggies, wagons, omnibuses, &c., considerable spoke and hub timber, with lease for about two years from 1st January, 1863, of water power, and room in the houses to run the machinery.

It was worth $8000.00 on gold basis, and cost much more than that.   Complainant had one-half interest in it, and had invested therein prior to April, 1861, about $7000.00.

Before Durand made his purchase he asked Parr about said property, and what he thought it was worth.   Parr told him that it was a good enterprise, worth from $12,000 to $15,000 at that time.   Durand asked him if Howard wanted to sell his interest, and what it had cost.   Parr informed him that he knew well what Howard had paid for his half interest; that it was from $6,000 to $7,000, but that he did not know whether Howard would sell.

Parr was Howard's agent and paid all or nearly all of said money for him.

EDWARD L. MORTON was examined by interrogatories. He testified as to the organization and changes in the Atlanta Spoke Company in substance as stated in the bill; the purchase of Williams' and McLean's interests by Durand. He stated that from the organization he had been the confidential adviser and foreman in the business, and knew the workings of the same; and that Howard, at time of Durand's purchase, owned one-half of the Atlanta Spoke Company, and this fact was recognized by everybody connected with the works. It was costly machinery, and from what Williams and McLean had said to him, he supposes it was worth, when Durand came in, $10,000.00 or $15,000.00. He was Durand's foreman, and knew several propositions from him to Howard were sent, looking to a settlement of their controversy.

He was the bearer of the written proposition set out in Durand's amended answer, and after Howard accepted it, he was the custodian of it as their common friend. After the acceptance, Howard deposited $6,000.00 in the Georgia Railroad Bank, in Atlanta, and took a certificate of deposit therefor. A memorandum of the substance of the agreement was entered on the certificate by Howard, and he delivered witness the same with authority to draw the money; at Howard's request, he took two wagons and went for the machinery, after he was perfectly assured that all was right for Durand's interests; he thought Howard had fully complied with the contract, and he was acting as much for Durand as for Howard; he says, "As will be seen by the ten days' limit in agreement between Howard and Durand, witness was bound to feel and act as instructed by both parties; the certificate of deposit endorsed as above stated, was taken by me and shown to Durand when I went for the machinery, and witness never dreamed that any objection would be urged to the delivery of the property or acceptance of the money; there was no objection to receiving the money, but Durand declared that not one cent's worth of the property should be taken away till he had received every dollar of the money. I considered this bad faith to Howard, so said, stating to Durand at the

time that Howard's complaint now was that he (Durand) had all the advantage, and that now, as a mutual friend, to give him the cash value of the property as agreed on, and let him at the same time have legal and actual possession of the same, was not the justice I had agreed to see done, and thus and for this reason the whole thing fell through. I offered to receipt him for each load as I took it away, and as soon as there was a fair and substantial compliance by him, to pay him the whole amount in cash."

He cannot state the value particularly, but the machinery was the best in use, ample enough for a business of $50,000 *per annum*, and the manufactured stock very large and perfect, perhaps more so than any similar one south of Newark, New Jersey. Parties employed with Durand told witness that Major Hawes rented it and it had been scattered about. He is a mechanic, long acquainted with such machinery, and inventor of valuable machinery. With the facilities of the Atlanta Spoke Company, &c., "it is a moderate estimate to say that $30,000.00 *per annum* might easily have been realized in good value for the last of year 1863 and first of 1864, so great was the demand for such things." He answers that he never had the slightest interest in the case.

Durand's solicitors read the affidavit of A. D. H. P. SHUMATE, who swore that when the injunction was served he was in Durand's employment, and so continued till Major Hawes came and took possession as Government officer; and that during that time neither Durand nor any of his employes used said machinery or any of the material belonging to the wheel business. He lived at said mill many years before the war, and since; worked for Durand and for the Government there; and Government agents took away said machinery and material to Augusta.

They also read the answers of A. R. SALLENBERGER to interrogatories. He said he had read the written contract alluded to; that he is a mechanic, and considered said machinery and material fully worth $6,000.00 in the then currency, when the contract was made. He was working for Durand making artillery wheels when he heard of the injunction, and

stopped the work on that account. Durand said he was ready to deliver the property to Howard. It was not delivered to him, or Morton, his agent, who called for it. Durand proposed to deliver it to Morton when paid for. Morton said he would not pay for it till he had it in the depot or cars at Decatur. Durand proposed to deliver it at the mills when paid for. Morton stated that he had a certificate of deposit to pay for the same. Witness don't remember seeing the certificate. Morton said he would carry the property to Decatur himself. He states that he has no interest in the case.

By a second set of interrogatories, this same witness stated that he stopped the work on the wheels about one month, and that Howard told him that he had bought out Durand's interest in said machinery and materials.

The Court decided that in view of all the facts of this case, it would not punish the defendant for contempt for a breach of the injunction, and discharged the rule, and complainant's attorney excepted.

A. W. HAMMOND and SON, R. F. LYONS, for plaintiff in error.

L. J. GLENN and SON, for defendant in error.

WALKER, J.

1. There is no question as to the power of a Court of Equity to enforce obedience to its orders by attachment. Code, sections 200, 3157, 4125, and 4127. The question here is, do the facts make such a case as to require this Court to control the discretion of the Court below.

2. It has been often decided that the action of the Superior Courts in granting or refusing injunctions will not be controlled, except when it may appear there has been a flagrant abuse of discretion. The same rule should apply to the action of the Courts relative to the punishment of parties alleged to be contumacious. Whether a contempt of Court

Howard *vs.* Durand.

has been committed which should be punished, may generally be safely left to the discretion of the circuit Judges. They are not likely to fail in enforcing due respect to their orders ; and their action in such cases should be final, unless there is something in the decision to show a most flagrant abuse of the discretion. Cabot vs. Yarborough, 27 Ga. R. 476. Especially should this Court be slow to control that discretion, where the circuit Judge has declined to punish the party. We are satisfied that we may safely leave to the circuit Judges, the infliction of such punishment as may be necessary to enforce obedience to their orders, and vindicate the authority and dignity of their Courts.

3. Without contesting this position, the plaintiff insists that his case comes under a different rule, that his motion is not made simply to vindicate the authority of the Court, but for the purpose of protecting his rights, that here the attachment sought is remedial, not to punish for an act done in contempt of the Court, but to compel the doing of an act necessary to the administration of justice. Cobb vs. Black, 34 Ga. R. 162. We recognize the distinction here drawn, and in a proper case, are ready to enforce the rule for which the plaintiff contends.

4. In this case, the defendant was enjoined from using or selling the property in litigation. This injunction, the plaintiff alleges, has been violated by defendant. Suppose the Court had " committed defendant for said contempt," would this afford any remedy to Howard ? Would it restore the property sold ? Do not the facts show that the only effect of the punishment, would be to vindicate the authority of the Court, and not furnish any remedy for the plaintiff? We think so. Hence the question was one for the discretion of the Court below. If this were a remedial proceeding, to which the plaintiff is entitled for the enforcement of his rights, then we would control the discretion of the Court below, and award to the party that relief to which, under the facts and the law, he would be entitled.

5. When the plaintiff made his application to a Court of equity, he showed such facts as entitled him to the aid of its

extraordinary powers. That Court laid its strong hand upon Durand, and would have preserved the property and protected Howard from all injury arising from the interference with it by Durand, had it not been for the subsequent conduct of Howard himself. Howard took upon himself the control and management of the business for which he had previously invoked the aid of the Court, and consented to a violation of the injunction granted at his instance. This being so, he must suffer the consequences. He cannot subsequently have the other party punished for a breach of the injunction, when that breach was by his consent. Mills *vs.* Cobby, 1 Meriv. R. 3 ; 3 Dan. Ch. Pr. 374. These parties entered into a new contract, by which the injunction was in effect dissolved ; and because defendant failed, as it is alleged, to comply with this contract, the Court is asked to punish him for the violation of the injunction previously granted. As evidence of the view that complainant took of his rights, we may refer to the fact that he sued on the obligation to recover the damages, to which he says he is entitled on account of Durand's failure to comply with the contract. This shows that complainant thought he had made a new contract, and if that contract had been carried out, was not the bill at an end without anything further to be done? If so, can it be pretended that the injunction was vital all the while?

6. A Court of equity will not lend its punitive powers to one party, for the purpose of coercing the opposite party into the making of new stipulations to which he had never agreed; nor, under pretence of punishing for a breach of an injunction, will it attempt to enforce a contract made subsequent to the granting of the injunction.

7. Equity will enforce the rights of the parties according to the rules and practice of the Court; and parties who invoke its aid, should not, by contract, thwart its proceedings and render nugatory its processes. Should they do so, they ought not to expect to be relieved from the consequences of their own interference.

Judge Harris, while he agrees in asserting the legal propositions here maintained, thinks the facts are not such as to

make them applicable. He thinks the judgment should be reversed, and an attachment awarded.

Judgment affirmed.

———

HARRIS, J., dissenting.

I do not concur in the judgment rendered in this case by the majority of the Court. The decision has been made, I think, upon an entire misapprehension of the facts. There is not one of them from which the *assent,* either positively or impliedly, of Howard can be inferred, to the violation of the injunction by Durand. This injunction had reference entirely to Howard's interest as a copartner. The negotiation begun afterwards by Durand, had not the slightest reference to the matters involved in Howard's bill, but was *an offer by Durand to sell to Howard his (Durand's) share in the partnership.* It fell through by the bad faith of Durand. Had this negotiation had any connection with Howard's interest as a partner, broken off as it was, by Durand's non-compliance with his agreement to sell, Howard ought not to be permitted to suffer any injury thereby; but surely when the negotiation had not the slightest relation whatever to the matters in controversy under Howard's bill, there can be no plausible reason assigned for not allowing him the benefit of an attachment for contempt, to coerce Durand to make good any damages he may have sustained,—not beyond the penalty of the injunction.