No. 24,001.

J. Park Smith, *Appellant,* v. C. A. Clothier, The Stafford County Gun Club Association, The Salt Marsh Hunting Association et al., *Appellees.*

SYLLABUS BY THE COURT.

1. Civil Contempt—*Order of Trial Court—Appealable.* In a proceeding for civil contempt the plaintiff may appeal from a judgment finding the defendants not guilty.

2. Same—*Procedure—How Conducted—Statute.* The procedure for civil contempt is properly conducted in accordance with section 260 of the civil code (Gen. Stat. 1915, § 7158). Other matters of pleading discussed.

3. Same. In a proceeding for civil contempt, when the charge is the violation of the final decree in an injunction suit, the merits of the original suit cannot be inquired into.

4. Same—*Acquiescence in Violation of Injunction—Proof Required to Establish Acquiescence.* Acquiescence by plaintiff of the violation of an injunction in his favor, by defendants, to be available to defendants in a proceeding for contempt for such violation, must be established by clear and convincing evidence, and of such a nature that it would have defeated the granting of the injunction had it been available to defendants at the time the injunction was granted.

5. Same—*Demurrer to Evidence Improperly Sustained.* Evidence examined, and *held,* the demurrer to plaintiff's evidence was improperly sustained.

Appeal from Stafford district court; Daniel A. Banta, judge. Opinion filed March 10, 1923. Reversed.

*Paul R. Nagle,* and *Harry T. Gray,* both of St. John, for the appellant.

*Robert Garvin,* of St. John, *F. L. Martin,* and *James N. Farley,* both of Hutchinson, for the appellees.

The opinion of the court was delivered by

Harvey, J.: This is an appeal by plaintiff from a judgment sustaining a demurrer to plaintiff's evidence and finding the defendants not guilty of contempt, at a hearing in which the defendants were charged with the violation of a permanent injunction previously rendered against them and in favor of plaintiff in the same case. A brief statement of the case will enable us better to understand the questions presented.

Rattlesnake creek flows through township 24, range 11, in Stafford county, entering the township at the southwest quarter of section 31 and running north of east to the northwest corner of

section 35, then northeast to the northeast quarter of section 25, thence northward and leaves the township in the northwest quarter of section 1. The plaintiff, J. P. Smith, is the owner of land in sections 1, 12, 13 and 24, through which the creek runs. C. A. Clothier is the owner of the west half of section 35; the Stafford County Gun Club Association owns the east half of section 35, and the Salt Marsh Hunting Association the northwest quarter of section 36. There is low, marshy ground in the northeast quarter of section 35 and the northwest quarter of section 36, frequented by ducks during the season and used for hunting ground. If the water is low or entirely gone there are few ducks, but when plenty of water is in the marsh it is quite a hunting resort. In March, 1909, C. A. Clothier leased for 99 years to the Stafford County Gun Club Association the right to maintain a ditch from Rattlesnake creek, at the northwest quarter of section 35, east along the north line of said quarter section. The Stafford County Gun Club Association and the Salt Marsh Hunting Association constructed a ditch near the north line of section 35 from the northwest corner of the section to the northeast corner, connecting it with Rattlesnake creek at the northwest corner of the section and placed a 24-inch tile in the ditch to carry the water from Rattlesnake creek to the salt marsh. The ditch was dug to a depth lower than the bed of Rattlesnake creek and through the ditch they diverted a large portion of the water in the creek. Rattlesnake creek ordinarily carries a flow of water a foot to eighteen inches deep, at times of a freshet it carries more, and at times of prolonged drought it carries very little water, but is usually a running stream. The plaintiff Smith objected to the defendants diverting the water from Rattlesnake creek to fill the salt marsh for hunting purposes, and brought a suit to enjoin them from so doing. The defendants named in this suit were: C. A. Clothier, Stafford County Gun Club Association, and the Salt Marsh Hunting Association. This case was tried by the court upon an agreed statement of facts. The court held the plaintiff to be a riparian owner and entitled to the use of the water; that the defendants, the Stafford County Gun Club Association and the Salt Marsh Hunting Association, owned no land through which the creek ran, and, hence, were not riparian owners, and that they had no right to divert the water from Rattlesnake creek to fill their marsh for hunting purposes; that the same was not a beneficial use of the water within the definition of that term as used in

*Campbell v. Grimes,* 62 Kan. 503, 64 Pac. 62, and that Clothier had no right to authorize the construction of a ditch through his land to permit the gun club and hunting association to divert the water from the' creek for a purpose not beneficial. This injunction was made permanent in December, 1919. The judgment entered was:

"That the defendants and each of them, their agents, employees and assigns be forever enjoined and restrained from diverting the water in Rattlesnake Creek out of the same through the ditch mentioned and described in plaintiff's petition, and that defendants and each of them be forever enjoined from maintaining said ditch for the purpose of diverting the water of said Rattlesnake Creek through said ditch from out of said stream, and that defendants are restrained and permanently enjoined from hereafter permitting the flowage of water out of said creek into and through said ditch."

In August, 1921, the plaintiff Smith filed a motion, verified by his affidavit, in the original injunction suit, setting out the final judgment entered in December, 1919, setting forth that the defendants had persistently and continuously violated the order of the court, except for a short period of time, and moved the court to issue an attachment and to name a day certain for a hearing why the defendants should not be punished as for contempt. The court made such an order and fixed a date for the hearing, and notice thereof was served upon defendants. On the day named the defendants appeared by counsel, orally demurred to the motion as being insufficient to put them on trial for contempt of the court's injunction, and their demurrer was sustained. The plaintiff then filed what he entitled a "Bill of Particulars, or Complaint," specifically naming the officers of the Stafford County Gun Club Association and the officers and members of the Salt Marsh Hunting Association; setting out the final judgment of the court of December, 1919, in the injunction suit, and charging the defendants, their officers, members, agents and employees, with the violation of the final judgment in the injunction suit. This was verified by plaintiff, and attached thereto were a number of supporting affidavits, and it contained a motion for an order to defendants to show cause why they should not be punished as for contempt. The court made an order, fixing a date certain, for the defendants to show cause why they should not be dealt with by the court as for an indirect contempt. Defendants appeared and filed an answer: first, a general denial; second, that if the water ran through the ditch it was without the

knowledge, consent or authority of defendants; third, that plaintiff acquiesced in the violation of the injunction; fourth, that the reason plaintiff did not have water at his place was because the water evaporated before it reached plaintiff's land; fifth, that plaintiff had plenty of water for his needs, and that one Rose who had land adjoining plaintiff diverted some of the water; sixth, that plaintiff was himself diverting water from the creek; seventh, that this complaint was made through malice and for extortion; eighth, that the property of defendants is kept for a game preserve, and is a breeding place for wild ducks, and when water is low it is necessary to turn water into the marsh to preserve the life of the fowls, and that the lay of the land is such that the water from the marsh flows back into the creek before it reaches plaintiff's premises; and ninth, that defendants had made application to the game warden under the Laws of 1921 to establish a game refuge, which application had been allowed and that the state of Kansas was in possession of their premises and interested therein. The plaintiff moved severally to strike out each of these defenses as not setting forth a legal excuse or justification for the defendants to violate the injunction granted by the court, which motion was overruled, and plaintiff filed a reply denying the allegations of the answer. The court held the burden of proof to be on plaintiff. The plaintiff offered his evidence; the defendants demurred thereto; the court sustained the demurrer, found defendants not guilty of contempt and discharged them, and taxed the costs to plaintiff.

The plaintiff appeals, alleging that the court erred, first, in sustaining the oral demurrer to plaintiff's motion and requiring plaintiff to file an amended motion, bill of particulars, or complaint, supported by affidavit; second, in overruling plaintiff's motion to strike out the several defenses in defendants' answer; third, in sustaining the demurrer to plaintiff's evidence and rendering judgment thereon.

Before considering appellant's alleged errors, we must consider an important question raised by the appellees.

Appellees contend that the appellant has no standing in this court; that the order sustaining the demurrer to the evidence and finding the defendants not guilty is not an order from which an appeal can be taken by plaintiff; that it is not a final order, as defined by section 566 of the civil code.

To determine this we must inquire into the nature of the contempt proceedings in this case. While the line of distinction is not always

Smith v. Clothier.

easy to point out, it is well recognized that contempt of court may be either criminal or civil. Rapalje, in his work on Contempt, section 21, gives the following general definitions relating thereto:

"Civil contempts are those quasi contempts which consist in failing to do something which the contemnor is ordered by the court to do for the benefit or advantage of another party to the proceeding before the court; while criminal contempts are all those acts in disrespect of the court or of its processes, or which obstruct the administration of justice or tend to bring the court into disrepute."

In 13 C. J. 6, the rule is thus stated:

"A criminal contempt is conduct that is directed against the dignity and authority of the court and may occur in either criminal or civil action and special proceedings. Civil contempt consists in failing to do something ordered to be done by a court in a civil action for the benefit of the opposing party therein, and is therefore not an offense against the dignity of the court but against the party in whose behalf the violated order is made. If, however, the contempt consists in doing a forbidden act injurious to the opposite party, the contempt may be considered criminal."

And further, on page 7:

"Criminal contempts being offenses directed against the dignity and the authority of the court, are offenses against organized society, which, although they may arise in the course of private litigation, are not a part thereof but raise an issue between the public and the accused and are, therefore, criminal and punitive in their nature. . . . Contempts prosecuted to preserve the rights of private parties are civil and remedial in their nature."

In *Gompers v. Bucks Stove & Range Co.*, 221 U. S. 418, the court considered and made a very clear analysis of the matter, as follows:

"Contempts are neither wholly civil nor altogether criminal. `And 'it may not always be easy to classify a particular act as belonging to either one of these two classes. It may partake of the characteristics of both.' *Bessette v. Conkey Co.*, 194 U. S. 329 [48 L. Ed. 1002, 24 Sup. Ct. Rep. 665]. But in either event, and whether the proceedings be civil or criminal, there must be an allegation that in contempt of court the defendant has disobeyed the order, and a prayer that he be attached and punished therefor. It is not the fact of punishment, but rather its character and purpose, that often serve to distinguish between the two classes of cases. If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court. It is true that punishment by imprisonment may be remedial as well as punitive, and many civil contempt proceedings have resulted not only in the imposition of a fine, payable to the complainant, but also in committing the defendant to prison. But imprisonment for civil contempt is ordered where the defendant has refused to do an affirmative act required by the provisions of an order which, either in form or substance, was mandatory in its character. Imprisonment in such cases is not inflicted as a punishment, but is intended to be

Smith v. Clothier.

remedial by coercing the defendant to do what he had refused to do. The decree in such cases is that the defendant stand committed unless and until he performs the affirmative act required by the court's order.

"For example: If a defendant should refuse to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance required by a decree for specific performance, he could be committed until he complied with the order. Unless these were special elements of contumacy, the refusal to pay or to comply with the order is treated as being rather in resistance to the opposite party than in contempt of the court. The order for imprisonment in this class of cases, therefore, is not to vindicate the authority of the law, but is remedial, and is intended to coerce the defendant to do the thing required by the order for the benefit of the complainant. If imprisoned, as aptly said *In re Nevitt* [54 C. C. A. 622], 117 Fed. Rep. 451, 'he carries the keys of his prison in his own pocket.' He can end the sentence and discharge himself at any moment by doing what he had previously refused to do.

"On the other hand, if the defendant does that which he has been commanded not to do, the disobedience is a thing accomplished. Imprisonment cannot undo or remedy what has been done, nor afford any compensation for the pecuniary injury caused by the disobedience. If the sentence is limited to imprisonment for a definite period, the defendant is furnished no key, and he cannot shorten the term by promising not to repeat the offense. Such imprisonment operates not as a remedy coercive in its nature, but solely as punishment for the completed act of disobedience.

"It is true that either form of imprisonment has also an incidental effect. For if the case is civil and the punishment is purely remedial, there is also a vindication of the court's authority. On the other hand, if the proceeding is for criminal contempt and the imprisonment is solely punitive, to vindicate the authority of the law, the complainant may also derive some incidental benefit from the fact that such punishment tends to prevent a repetition of the disobedience. But such indirect consequences will not change imprisonment which is merely coercive and remedial, into that which is solely punitive in character, or *vice versa*.

"The fact that the purpose of the punishment could be examined with a view to determining whether it was civil or criminal is recognized in *Doyle v. London Guarantee Co.,* 204 U. S. 599, 605, 607 [51 L. Ed. 644, 645, 27 Sup. Ct. Rep. 313], where it was said that 'while it is true that the fine imposed is not made payable to the opposite party, compliance with the order relieves from payment, and in that event there is no final judgment of either fine or imprisonment. . . . The proceeding is against a party, the compliance with the order avoids the punishment, and there is nothing in the nature of a criminal suit or judgment imposed for public purposes upon a defendant in a criminal proceeding.' *Bessette v. Conkey Co.,* 194 U. S. 328 [48 L. Ed. 1002, 24 Sup. Ct. Rep. 665]; *In re Nevitt* [54 C. C. A. 622], 117 Fed. Rep. 448; *Howard v. Durand,* 36 Ga. 359 [92 Am. Dec. 767]; *Phillips v. Welch,* 11 Nev. 187.

"The distinction between refusing to do an act commanded—remedied by imprisonment until the party performs the required act; and doing an act forbidden—punished by imprisonment for a definite term; is sound in principle, and generally, if not universally, affords a test by which to determine the character of the punishment." (p. 441.)

Under these definitions there is no difficulty in classing the contempt proceedings in this case as civil rather than criminal. The suit in the first place was purely a civil suit in equity to enjoin the defendants from doing a thing which injuriously affected the plaintiff. The suit was not in any sense one of a public nature, but was private litigation between private parties for the protection of civil rights. The injunction granted by the final decree of December, 1919, was mandatory in its nature, and the complaint, which gave rise to the contempt proceeding was that the defendants had failed to do and perform the acts and things required of them by the mandatory injunction. The relief, if any, granted in the contempt proceedings, while it might take the form of imprisonment of defendants or a fine (though the fine might be paid into the school fund) would be remedial in its nature and inure to the benefit of the plaintiff, and, of course, defendants could relieve themselves of the punishment imposed by a compliance with the terms of the injunction.

There is some confusion among the authorities concerning the right of appeal or right of review from the judgment of the court in a contempt proceeding. Much of this confusion is eliminated when the questions are classified as to whether or not the contempt is civil or criminal and as to whether or not the right of review is conferred by statute. While there are some decisions to the contrary, the weight of authority is that in a purely civil contempt proceeding the judgment of the court, whether it finds the defendant guilty or not guilty, is such a final order respecting the rights of the parties that the aggrieved party may appeal from it, and this view is supported by the better reasoning. In 13 C. J. 100, the rule is thus stated:

"In some jurisdictions either party may appeal in like manner and with like effect as from a judgment in an action and an order adjudging one not guilty of a civil contempt is appealable, but in others an order refusing to punish for an alleged civil contempt is not reviewable on appeal."

In *Vilter Mfg. Co. v. Humphrey*, 132 Wis. 587, it was held that an order in a civil proceeding under the statute of 1898, § 3477, subdivision 3, authorizing a proceeding to punish for contempt for violating an order of the court adjudging that one is not guilty of contempt, is appealable.

In *Jastram v. McAuslan*, 29 R. I. 390, it was held that a decree denying and dismissing a petition that defendant trustees be adjudged in contempt for not paying to complainant a specified sum in

satisfaction of a decree previously entered, determines the rights of the complainant and is a "final decree" within the constitutional amendment (art. 12, § 1), granting to the supreme court appellate jurisdiction on all questions of law and equity.

In *Red River Valley Brick Corp. v. Grand Forks,* 27 N. Dak. 431, 440, it was held that an appeal will lie to the supreme court from an order finding defendants not guilty of civil contempt.

In *Railroad v. Gildersleeve,* 165 Mo. App. 370, it was held that an appeal from a judgment adjudging one guilty of contempt for violating an injunction in a civil action involves a civil controversy under the statute authorizing appeal in civil cases.

In *Howard v. Durand,* 36 Ga. 346, it was said:

"In some cases the punishment of a party for a contempt is a remedial proceeding to which the opposite party is entitled, though it may not be necessary for the vindication of the authority of the court."

"In such a case if the court below fail to give the party his rights this court will correct the error and grant the party that relief to which he is entitled." (Syl. ¶¶ 3, 4.)

*Vilter Mfg. Co. v. Humphrey,* 132 Wis. 587, 13 L. R. A., n. s., 591, was an appeal from an order denying a motion to punish for contempt of court in violating an injunction order. The action was in equity to enjoin the strikers and labor unions from interfering with plaintiff's business. The court entertained the appeal for the reason that the primary purpose was the protection of the rights of the opposite party, and held it to be a civil proceeding.

In *The State v. Horner,* 16 Mo. App. 191, being a mandamus suit to compel the trial court to issue its process commanding third persons to obey the decree of the court where the court has made final order refusing such relief, mandamus was refused for the reason that the matter was appealable as final judgment in a civil case. The court said:

"Where, as in this case, the proceeding is instituted by a party to enforce a civil remedy, it assumes the essential characteristics of an adversary proceeding, and the court does not, as a general rule, confine its inquiry to the answers of the respondent to interrogatories, but it hears evidence produced by both parties. (Citing cases.) The decision of the court, by whatever name it be called, and whether it be in favor of or against the accused, possesses the essential characteristics of a final judgment dispositive of a substantial right. This being so, whilst it is a rule of common law procedure that an appeal does not lie from a judgment in a proceeding for a criminal contempt, yet it is generally held that where the proceeding is, as in this case, a remedial proceeding as for a contempt, the final judgment or order by which the court

ends the proceeding and exhausts its jurisdiction, is subject to revision by appeal. (Citing cases.) . . . Clearly, such an order is a 'final judgment or decision' in a 'civil cause'; and whether it be the subject of appeal cannot be determined by the question of whether it was rendered in favor of the one party to the controversy or the other. If it be a judgment convicting the defendant of the contempt charged and imposing upon him a punishment therefor, it is a final judgment by which he may be aggrieved and which may be the subject of an appeal by him. If, as in this case, it be a judgment discharging the accused from prosecution, it finally disposes of the right demanded by the other party to the civil proceedings, and it is a judgment by which he may be aggrieved within the meaning of the statute." (pp. 195, 196.)

Many other cases might be cited.

In this case a judgment upon the contempt proceedings is "an order affecting a substantial right, made in a special proceeding or in a summary application in an action after judgment" within the meaning of the term as used in section 566, of the civil code, and is, therefore, "a final order" from which the aggrieved party may take an appeal within the meaning of that term as used in section 565 of the civil code.

This leads us to a consideration of the matters alleged by appellant as error. First, that the court erred in sustaining the oral demurrer to plaintiff's motion.

Section 3107, of the General Statutes of 1915, provides the procedure for indirect contempt as follows:

"That upon the return of an officer on process or an affidavit duly filed showing any person guilty of indirect contempt, a writ of attachment or other lawful process may issue, and such person be arrested and brought before the court or judge in chambers; and thereupon a written accusation setting forth succinctly and clearly the facts alleged to constitute such contempt shall be filed, and the accused required to answer the same, by an order which shall fix the time therefor and also the time and place for hearing the matter; and the court or the judge in chambers shall, on proper showing, extend the time so as to give the accused a reasonable opportunity to purge himself of such contempt. After the answer of the accused, or if he refuse or fail to answer, the court or judge may proceed at the time so fixed to hear and determine such accusation upon such testimony as shall be produced. If the accused answer, the trial shall proceed upon testimony produced as in criminal cases, and the accused shall be entitled to be confronted with the witnesses against him; but such trial shall be by the court or judge. If the accused be found guilty, judgment shall be entered accordingly, prescribing the punishment."

This is one section of chapter 106, of the Laws of 1897, as amended by chapter 123 of the Laws of 1901, pertaining to contempts of court, and outlines the proceedings that should be followed in all that class of contempt cases properly classified as criminal contempt.

Section 7158 of the General Statutes of 1915, being section 260 of the civil code, as revised and passed in 1909, reads as follows:

"An injunction granted by a judge may be enforced as the act of the court. Disobedience of any injunction may be punished as a contempt, by the court or any judge who might have granted it in vacation. An attachment may be issued by the court or judge, upon being satisfied, by affidavit, of the breach of the injunction, against the party guilty of the same, and he may be required, in the discretion of the court or judge, to pay a fine not exceeding two hundred dollars, to make immediate restitution to the party injured, and give further security to obey the injunction; or, in default thereof, he may be committed to close custody until he shall fully comply with such requirements, or be otherwise legally discharged."

The record in this case would indicate that the respective parties rather mingled the procedure as outlined by the two sections above quoted.

Where the suit is one for injunction relating to private rights and the final injunction decree is mandatory in its nature, requiring certain things to be done by defendant, the proceeding for contempt for the disobedience of such mandatory injunction is for the benefit of the plaintiff and remedial in its nature, and the procedure outlined by section 7158, of the General Statutes of 1915 above quoted applies. The verified motion filed by plaintiff in this case treated as an affidavit under this section, while naming the defendants as in the original suit, did not name the officers and members of the defendant associations and the court did not commit error in requiring a new affidavit to be filed more specifically naming the particular persons charged as being guilty of the contempt and more specifically setting out the facts.

Appellant contends that his motion to strike out the several so-called defenses in the answer of the defendants should have been sustained. The first defense was a general denial, amounting to a plea of not guilty, and the second was in effect a plea of good faith. It is not improper for a court of equity to let a party show his good faith. There was no error in the court overruling the motion to strike these two defenses.

The third paragraph is rather a weak effort to plead acquiescence by the plaintiff of the violation of the injunction by defendant, but is insufficient for that purpose. The books have but a few cases discussing the acquiescence of one party to an injunction suit in the violation of the injunction order by the other party.

In *Howard v. Durand*, 36 Ga. 346, the defendant was enjoined from selling certain machinery. Soon after the final decree was entered in the injunction suit the parties entered into a contract in writing by which, for a named consideration, the sale might proceed. Later the defendant did not comply with the payments under the contract and plaintiff proceeded against him for contempt. The court declined to find the defendant guilty, saying:

"These parties entered into a new contract, by which the injunction was in effect dissolved; and because defendant failed, as it is alleged, to comply with this contract, the court is asked to punish him for the violation of the injunction previously granted." (p. 360.)

In *Holcombe v. Dupree*, 50 Ga. 335, a sheriff was cited for failing to levy an execution. He answered that he had not proceeded because of written orders of the plaintiff not to proceed with it and it was held that the sheriff should not be punished for contempt.

In *Kempson v. Kempson*, 61 N. J. Eq. 303, the husband and wife lived in New Jersey. The husband went to North Dakota, claiming to have established residence there, and brought suit for divorce. The wife obtained an injunction restraining him from procuring such divorce. He had notice of this but proceeded to obtain his decree, in which was made an order to pay the wife alimony. He later returned to New Jersey, resumed his former relations with his wife for a time, paid her weekly alimony as ordered by the North Dakota court for several months, and wrote on the checks "in accordance with the decree of divorce in North Dakota." The wife thereafter brought contempt proceedings. He claimed she had acquiesced in his violation of the injunction. The court held she was not estopped and required the husband to pay a fine to the state and to take proper measures to undo the contemptuous act by having the decree in North Dakota opened and set aside.

In *ex parte Cash*, 9 L. R. A., n. s., 304; (50 Tex. Crim. Rep. 623) it was said:

"The mere offer by an agent of the complainant in the suit to purchase an article which defendant is enjoined from selling, for the purpose of determining whether or not the injunction is being violated, is not such an invitation to violate the injunction that he will not be guilty of contempt in case he makes the sale."

In *Bond v. Pennsylvania Co.*, 126 Fed. 749, where a railroad company, against which an injunction had issued at the instance of an abutting owner, restraining it from running its tracks in the

street, violated the same, and continued such violation for about eight years without objection on the part of such abutting owner, it was held, not to amount to acquiescence on his part so that it could be used as justification in contempt proceedings for its violation.

In *Bower v. Von Schmidt,* 87 Fed. 293, it was held that a consent or solicitation by one party to the suit, to the violation by the other of the injunction issued therein, will not justify such violation; but that it is necessary to bring such arrangement to the attention of the court issuing the injunction and to obtain a dissolution or modification thereof.

High on Injunctions lays down the rule as follows:

"But to deprive a party obtaining the writ of the right to move for a committal for its breach, on the ground of his acquiescence therein, a strong showing of acquiescence must be made out. Thus, where defendant seeks to evade his liability for breach of an injunction restraining him from the use of complainant's trademark, upon the ground of acquiescence, he must show such a degree of acquiescence as would suffice to create a new right in himself." (§ 1450.)

In this case the plaintiff is a riparian owner with the right to use the water from this stream. It may be questioned whether he could make any valid agreement with the defendants, who are not riparian owners, for an improper use of the water. Certainly, he could not do so as against other riparian owners. True, he might remain silent and not assert his rights, but that would not avail the defendants anything, since it had already been adjudicated that their use of the water was not for a beneficial purpose. From the meager authorities it would appear that the true rule is that after an injunction is granted to a party to protect his rights in a civil matter, his acquiescence in the violation of the injunction could not be available as a defense unless it was of such a nature, as being a new contract concerning the subject matter of the original suit, that had it been available to the defendant at the time the original injunction was granted, it would have been sufficient to defeat the granting of the injunction, and that such acquiescence must be established by clear and convincing proof. The third paragraph of defendant's answer falls far short of this, and plaintiff's motion to strike it should have been sustained.

Without making detailed analysis of the fourth, fifth, sixth, seventh and eighth defenses set up in defendant's answer, it is clear that they attempted to relitigate the right to use the water as

against plaintiff, or set up other matters that in no way constitute a defense, and each of them should have been stricken out.

In the ninth paragraph of their answer defendants plead as a defense the establishment of a game refuge on their property in accordance with chapter 197 of the Laws 1921. There is nothing in that statute that affects the rights of riparian owners to the water in a stream and this paragraph of the answer should have been stricken out.

Practically speaking, there was but one question before the court, and that was whether or not the defendants had complied with the mandatory injunction order and judgment of the court rendered December, 1919. Other matters pleaded should not have been permitted to cloud the real and only issue in the case.

Appellant complains of the court sustaining a demurrer to plaintiff's evidence. The evidence, so far as is relates to the real question in controversy, is in substance as follows:

The plaintiff, Smith, testified that he had been to the ditch where it opened from the creek a number of times after the injunction was granted, and up to August, 1921, had always found the ditch open and never found it closed. It has a tile two feet in diameter where the water runs out of the creek into the ditch. This tile was covered. He had seen it a great many times and was never there when it was closed. C. A. Clothier, a defendant, testified that he was acquainted with the ditch; that it had never been filled; that its condition was just like it was when the permanent injunction was granted; that the flow of water was stopped there once before the permanent injunction was granted and once since. He had been there a number of times; sometimes there was water running through there. In the spring of 1921 it had been shut up to about harvest and been running ever since. He knew the township officers wanted to work a road along near the ditch and that they said they could not on account of the water. He did not shut the water off; did not have time. W. H. Gahm, township clerk, saw the ditch in April, 1921, and six or eight times afterwards. In April the flowage of water through the tile was partly closed by an inch plank nailed together and set at the mouth of the tile and a little dirt thrown on it. The closing was not very permanent; the next time he saw the ditch it was open and the water was running. They wanted the road graded along the ditch, but it was under water which had run into it from the ditch. One day he saw Mr. Petrie and John McGuire working in

the ditch, cleaning it out with shovels, so the water would go down into the marsh. Frank Green lived in St. John; saw the ditch a few times and the water was flowing out of the creek through the tile into the ditch. The tile was about a third full. There was nothing to stop the flow of the water into the tile. Will Petrie, one of the defendants, lived on the salt marsh and looked after it for the Hutchinson association. He constructed this ditch when it was made and put in a 24-inch galvanized tile 16 feet long, covered with dirt where the water came out of the creek. He never closed the flow of the water after the injunction suit. The officers and some of the members of the Hutchinson association were there after the injunction suit and it was talked over at the club. "I don't remember who told me but it was the understanding that the injunction had been allowed, and to keep away from the ditch entirely." The tile had been closed several times. He had seen the water running. The secretary of the club ordered me to stop it, but at that time it was stopped. It had two boards that closed up one end and had sticks in it and tumble weeds and was practically stopped. "I have seen it mighty near stopped." The tile was not taken out. Charles Petrie lived on the Stafford County Gun Club Association premises; was acquainted with the ditch and the tile; had seen them quite often, perhaps twenty times. The water was not at all times flowing through, but part of the time it was. It was not entirely closed all summer. He stopped it up once with a sack of cement at the lower end and four loads of dirt and some boards at the other end. He had put boards in there twice, but they had been removed or washed away. In some places the road running along the ditch was impassable because of the water from the ditch. The tile had never been taken out and the ditch had never been filled although he put some dirt in it. A. H. Watson, a member of the Stafford County Gun Club Association and a director, testified that after the injunction the directors ordered the ditch closed, but after that order he saw the water flowing and again ordered it closed. This time the order was made to Charlie Petrie. James N. Farley, a member and trustee of the Salt Marsh Hunting Association, testified that the board of directors ordered the ditch closed. He never saw the ditch until the middle of August, 1921. At that time the water was running from the creek through the tile. J. W. Richardson was acquainted with the ditch and tile; saw it in the latter part of June, 1921, and it was open. He examined both ends of the tile. There

Smith v. Clothier.

was nothing to obstruct the water. A. W. Hartnett, an officer of the Stafford County Gun Club Association, was at the ditch one Sunday shortly after the permanent injunction was granted and he and two others worked there about two hours, drove some two-by-sixes down in front of the tile and threw dirt on. He was there again in March or April, 1921, and the water was flowing some. The ditch was not filled up and the tile had not been removed. Fred Erdsick was township trustee. He visited the ditch three times in the summer of 1921. Every time he was there the water was running. He had had notice from an attorney that the township would be sued unless it fixed the road along this ditch, and went down to look at it and found water so he could not work. He had a talk with one of the defendants and told him he would have to shut the ditch before they could build the road, and he said they would shut it, but the ditch was not shut. The ditch and tile are still there.

From this recital of the evidence it will be seen that there was ample grounds to sustain the plaintiff as against a demurrer to the evidence. In view of the fact that a number of the witnesses called were defendants in the case, including the persons living on the grounds of the two associations, it would seem that practically all of the evidence on the matter was before the court. It seems clear that the efforts of the defendants to comply with the order of the court granting the permanent injunction were superficial and ineffective. We have no hesitation in saying that the court erred in sustaining the demurrer to the evidence.

The case is reversed, with directions to the court below to set aside the judgment in favor of the defendants; to overrule the demurrer to the evidence; to sustain plaintiff's motion to strike out paragraphs three to nine, both inclusive, of defendants' answer, and to proceed with the case in accordance with this opinion.