Nos. 18,967 and 19,917
(Consolidated).

MARY J. HOLLOWAY, *Appellee,* v. THE PEOPLES WATER COM-
PANY, *Appellant.*

### SYLLABUS BY THE COURT.

1. INJUNCTION— *Contempt*— *Evidence*— *Deposition.* The admission in
evidence of a certain deposition and letter, if error, was immaterial.

2. SAME—*Decree Retaining Jurisdiction for Further Orders.* That por-
tion of the decree of May 13, 1912, retaining the cause "for further
orders should the same be deemed necessary in the future, to in justice
and equity conserve and protect the rights of respective parties
hereto," left the court with jurisdiction to modify or change such
decree at a subsequent term and before final dismissal of the suit.

3. SAME—*Evidence—Findings.* The evidence supports the findings and
decrees and orders of the trial court.

4. INJUNCTION — *Contempt — Punishment — Civil Procedure — Statute.*
Under section 6 of article 6 of the constitution (Gen. Stat. 1915, § 208)
the fine for contempt in violating an injunction, goes to the support
of common schools, although the proceeding to punish for such con-
tempt was in this case civil rather than criminal.

5. SAME—*Meaning of "Restitution."* "Restitution," as used in section
260 of the civil code (Gen. Stat. 1915, § 7158), when applied to the
situation here presented, means to restore, reimburse or make good.

6. INJUNCTION—*Contempt—Judgment—Fine—Compensation.* For viola-
tion of the injunction it was proper to fine the defendants and also
to require them to pay the plaintiff the sum named to compensate
her for her expenses incurred in the prosecution of her action.

7. SAME—*Contempt—Form of Judgment.* While it was incorrect and
therefore erroneous to call such payment a fine, to reverse for this
misuse of the word "fine" would be an excess of nicety, and hence the
judgment as correctly construed is affirmed.

Appeal from Woodson district court; OSCAR FOUST, judge.
Opinion filed May 12, 1917. Affirmed.

*Giles H. Lamb,* and *W. E. Hogueland,* both of Yates Center,
for the appellant.

*G. R. Stephenson,* of Yates Center, and *Frank G. Drenning,*
of Topeka, for the appellee.

The opinion of the court was delivered by

WEST, J.: The plaintiff, who resides and owns property in block 17 in the city of Yates Center, sued the water company to enjoin it and its officers, agents and employees from permitting water to escape from its pipes and tank in such a manner as to fall upon her property, alleging that on numerous occasions her premises had been flooded by the overflow of the steel tank of the defendant, situated in block 17. The court found that the company had repeatedly caused its tank to overflow the plaintiff's premises to her inconvenience and damage, sometimes by the unavoidable clogging of valves or other natural causes, and at numerous times from lack of care on the part of its employees, and ordered that the company, its officers and any one acting for or in its behalf be enjoined to exercise due care in the furnishing and adjustment of the machinery and appliances at and about the water plant and tank to prevent the overflow of the latter so as to overflow or otherwise injure the property of the plaintiff; that if by injury or accident to the machinery or by failure of the appliances at the power house to register the altitude of water in the tank, the company and its employees should have no actual knowledge or notice of such overflow, then upon notice given it the defendant was required to take proper steps to place such machinery and appliances in order, and stop and prevent such overflow. It was further ordered that they be restrained and enjoined from wantonly, maliciously, recklessly or carelessly causing or permitting such overflow. The last paragraph of the decree was in these words:

"It is further considered, ordered, adjudged and decreed that this cause be retained by the court for further orders should same be deemed necessary in the future, to in justice and equity properly conserve and protect the rights of respective parties hereto."

After the close of the term the plaintiff filed a motion to vacate and modify the decree and to render another in lieu thereof, setting up that since May 13, 1912, the defendant had caused, suffered and permitted its tank to overflow large quantities of water upon her land twelve different times. This motion was supported by the affidavits of two witnesses who testified to numerous overflows since the date of the decree.

The defendant sought to show that instructions had been given to its employees to use more than ordinary precaution to prevent overflow and that the best known appliances were used. The decision on the motion was rendered July 14, 1913, enjoining the company, its officers or agents or any one acting on its behalf from so operating its machinery, appliances and water tank as to cause an overflow upon the plaintiff's premises, and modifying the decree of injunction rendered May 13, 1912, so as to conform to the later decree. From this an appeal was taken, the record reciting the filing of a motion for a new trial and its denial. It is contended that no record of such motion can be found, but owing to the recital in the abstract and the statements of counsel upon the argument, and later by affidavits, it must be deemed that such motion was filed and overruled. March 21, 1914, the plaintiff filed accusations against the president and general manager, charging them with indirect contempt by repeatedly permitting the tank to overflow on the premises of the plaintiff on some seventeen different dates, and charging that each of these officers wholly neglected to give proper supervision to the pumping and storing of water in the tank by neglecting to put in an electric altitude gauge, and wholly failed to make any provision whatever to prevent overflow, and failed to have an employee on duty at all times when pumping water into the tank to receive telephone calls when the tank overflowed, and failed to prevent such overflows after being notified on two days mentioned and on other days referred to. Respondents moved to strike from the accusations certain portions thereof, which motion was overruled; whereupon they moved to quash the accusations, which motion was likewise overruled; also a demurrer, after which they filed their verified answer denying any violation of the court's injunction or any wish or desire to violate it, and asserting their will and wish to "sustain the general scheme of good government, including respect and submission to all orders and judgments of all courts of acknowledged and accredited jurisdiction until such orders or judgments were and are properly modified, set aside or reversed according to the regular order and proceeding of law, and in particular, the orders and judgments of this court as the court of general jurisdiction within and for the

Holloway y. Water Co.

judicial district wherein defendant company is located and operating, and that all orders and judgments of this court have been complied with to the full and utmost extent."

Further, that they were with the exercise of all human care unable to comply with the decree, and if there had been a seeming violation it was because it was not within their power to prevent such apparent noncompliance. Then followed a statement as to the franchise and function of the defendant, its duties and requirements, and an assertion that the tank was equipped with the most practically scientific and perfect device for automatically cutting off the service that could be procured or placed thereon. They also alleged that the company had appealed from the decree on which the accusations were based, and charged that the latter were made from "spite, viciousness and antagonism to defendant company and the public in general." The accusations were heard by the court and the testimony of five witnesses for the plaintiff was produced. Various overflows were described, some of which extended to the premises of the plaintiff, who testified that the tank overflowed March 3, 7, 8 and 10, 1914, and October 10, 1913.

"It ran over in great quantities, it was so wet all over my yard that the children got their feet wet, water was sprinkling all over my yard. My yard was all covered with water on the 7th. It ran over again on the 8th and twice on Sunday. That was in March, 1914. It delayed me making garden. It made it so wet I had to put on my rubbers to get out."

A demurrer to the evidence was overruled, and respondents testified as to the efforts they had made to prevent overflow. The president stated that he had studied practically all the schemes to keep tanks from overflowing, and had tried very hard to keep this tank from overflowing and had not knowingly or intentionally permitted it to overflow. The general manager testified that he had received no complaint from the plaintiff of any overflow, that he had the valve replaced on occasion of leakage at one time and had instructed the pumpers that the tank must not overflow, that it was necessary to keep it practically full to give pressure for fire protection, and he knew of no mechanical device that would absolutely prevent

overflow. In rebuttal a deposition was offered and objected to. The ruling on the objection was reserved and the deposition was read. This described a certain valve the witness claimed would prevent overflow "as near as anything automatic can do so." The plaintiff then offered in evidence a letter from the company making or selling this valve, which letter was addressed to the plaintiff's attorney and set forth the merits of the device, which letter was objected to but read, the ruling on its admission being reserved. The president testified that he had never heard of but one valve of the kind described in use in this country and that that one did not work correctly. The abstract recites that no evidence of negligence, wantonness, willfulness or intention was offered by the plaintiff. The court found the company and the respondent's president and general manager guilty of indirect contempt as charged.

"It is therefore considered, ordered and adjudged that the defendants pay a fine of One Hundred Dollars ($100.00) and it is further considered, ordered and adjudged that of such fine $75.00 thereof be paid to Mary J. Holloway, plaintiff, to compensate her for expenses incurred in the prosecution of her action."

From this order the respondents appeal, and the two appeals, the two causes having been consolidated, were presented and are considered together.

Twenty specifications of error are urged covering the various rulings in all the hearings referred to, including considerable complaint about the insufficiency of the accusations filed in the contempt matter. The main contentions, however, center around the notion that the first injunction was a finality and the attempt of the court to hold the case open for future orders was a nullity; the alleged error in opening up and modifying this decree at a subsequent term, the insufficiency of the evidence to warrant the judgment rendered in the contempt proceeding, and the alleged invalidity of that portion of the judgment requiring three-fourths of the fine to be paid to the plaintiff.

Serious complaint is made of admission in evidence in the injunction matter of a deposition and letter. It is necessary only to say that in such a trial before the court without a jury an examination of their contents shows that they could not

Holloway v. Water Co.

have had any prejudicial effect, and if any error was committed (Gen. Stat. 1915, § 3107) it was immaterial.

Stress is laid on the public-service nature, functions and requirements of the defendant water company and on the doctrine that its duties to the inhabitants of Yates Center are paramount to the rights of adjacent property owners who may in a slight degree be damaged or inconvenienced by leakage or overflows. On the other hand, attention is called to numerous decisions that the duties of a water company do not ·authorize or justify the creation of a private nuisance. With both these doctrines we are in full accord, and the appeals will be considered in the light of both theories, which are not only well established but harmonious.

No attempt will be made to settle the dictionary question as to whether the decree of May 13, 1912, was final or interlocutory. Definitions do not always define. The journal entry bears abundant evidence on its face of judicial intention to put the parties in proper relation to each other, or at least require them to act in such relation, retaining full jurisdiction 'to make other or different orders as future exigencies might arise. Judge Story in his work on *Equity Jurisprudence,* volume 1, 13th edition, page 21, said:

"But Courts of Equity are not so restrained. Although they have prescribed forms of proceedings, the latter are flexible, and may be suited to the different postures of cases. They may adjust their decrees so as to meet most if not all of these exigencies; and they may vary, qualify, restrain, and model the remedy so as to suit it to mutual and adverse claims, controlling equities, and the real and substantial rights of all the parties. . . . So that one of the most striking and distinctive features of Courts of Equity is that they can adapt their decrees to all the varieties of circumstances which may arise, and adjust them to all the peculiar rights of all the parties in interest; . . ."

"Sometimes the character of the decree as final or interlocutory may be affected by what the decree itself declares in this regard, as indicating the purpose of the court with respect to ·further proceedings; but if the decree is in its effect necessarily interlocutory, it can not be made final by any phraseology or style tending to so characterize it." (16. Cyc. 472.)

"The injunction should be broad enough to cover the whole case, but it may be granted as to part of the bill and refused as to the rest. It may, in a proper case, provide for a modification of the injunction when changed conditions require it." (22 Cyc. 966.)

The court is one of general jurisdiction and had unquestioned jurisdiction of the parties and the subject matter, and

as in any other case questions of continuance or dismissal were matters very largely of discretion, and it would go counter to its plain intention and equally plain prerogative to hold that the order made concerning the management of this plant by the defendant caused the jurisdiction of the court to end with the ending of the term.

Reading the record in cold blood, uncolored by the manifest feeling of impatience with the plaintiff and with the result of the hearings possessed by the defendants, we have no difficulty in holding that the evidence warranted the court in decreeing the defendants to be in contempt. Nothing has been suggested and nothing occurs from examination and reflection constituting a sufficient excuse for the repeated interference with the plaintiff's premises by the overflow of the defendant's tank. Finding that she had been so many times before, during and after judgment, confronted with a condition amounting to the maintenance of a nuisance, it was in accordance with her rights and no impairment of defendant's rights that adjudication of contempt was made.

We can not agree with the defendants that the proceeding was criminal in its nature, in the sense of a prosecution for crime, for, while the statute provides that "the trial shall proceed upon testimony produced as in criminal cases, and the accused shall be entitled to be confronted with the witnesses against him" (Gen. Stat. 1915, § 3107), the proceeding in this case was not for the purpose of enforcing the criminal statutes but for the vindication of the plaintiff's rights to be let alone and live untroubled by repeated overflows of her property caused by the acts or carelessness of the defendants. The ægis of section 6 of article 6 of the constitution is raised and thus quoted in defendant's brief:

"That all fines shall go to the school fund of the county in which the money is paid or fine collected, for the support of the common schools."

The correct reading is:

"And the proceeds of fines for any breach of the penal laws, shall be exclusively applied in the several counties in which the money is paid or fines collected, to the support of common schools." (Gen. Stat. 1915, § 208.)

Violation of a temporary injunction was by the circuit court of appeals of the eighth circuit held to be civil and not

criminal contempt in *Merchants' Stock & Grain Co. v. Board of Trade,* 187 Fed. 398, citing numerous authorities. To a similar effect is *Kreplik v. Couch Patents Co.,* 190 Fed. 565; *Morehouse v. Giant Powder Co.,* 206 Fed. 24; and *Bessette v. W. B. Conkey Co.,* 194 U. S. 324. See, also, *Gompers v. Buck's Stove and R. Co.,* 221 U. S. 418; and *O'Brien v. The People,* 216 Ill. 354. In the *Merchants' Stock & Grain Co. v. Board of Trade* case it was said in the opinion:

"The truth is that substantial benefit to a private party preponderating over that to the government is the distinguishing characteristic of a civil contempt, and that benefit is often as great and it arises as frequently from judgments for contempts for disobedience of a prohibitory as of a mandatory order or judgment." (p. 400.)

In the Bessette case the supreme court quoted from Judge Sanborn's opinion in *In re Nevitt,* 117 Fed. 448, with approval:

"Proceedings for contempts are of two classes, those prosecuted to preserve the power and vindicate the dignity of the courts and to punish for disobedience of their orders, and those instituted to preserve and enforce the rights of private parties to suits, and to compel obedience to orders and decrees made to enforce the rights and administer the remedies to which the court has found them to be entitled. The former are criminal and punitive in their nature, and the government, the courts and the people are interested in their prosecution. The latter are civil, remedial and coercive in their nature, and the parties chiefly in interest in their conduct and prosecution are the individuals whose private rights and remedies they were instituted to protect or enforce." (194 U. S. 328.)

"It may not be always easy to classify a particular act as belonging to either one of these two classes. It may partake of the characteristics of both. A significant and generally determinative feature is that the act is by one party to a suit in disobedience of a special order made in behalf of the other." (p. 329.)

Very recently, in *Barton v. Barton,* 99 Kan. 727, we had occasion to consider a cognate question—contempt for violating an order made in a divorce case for expenses and support of a minor child. It was there said the primary object of the proceeding was to protect private rights and only incidentally to vindicate the authority of the law:

"While the punishment of such contempt takes on a criminal phase, it is really remedial in character and is sometimes designated as a civil contempt." (p. 728.)

So it can hardly be said that the fine in question was by the constitutional provision referred to required to be paid to the

county for the support of common schools. But in 1868 the legislature enacted section 8257 of the General Statutes of 1915, requiring that—

"All fines and penalties imposed and all forfeitures incurred in any county shall be paid into the treasury thereof, to be applied to the support of the common schools."

Regardless of the constitution this would require any fine imposed to be thus applied; but at the same time the legislature enacted section 7158, a slight verbal change being made in 1909, providing that for violation of an injunction the guilty party may be required—

"To pay a fine not exceeding two hundred dollars, to make immediate restitution to the party injured, and give further security to obey the injunction; or, in default thereof, he may be committed to close custody until he shall fully comply with such requirements, or be otherwise legally discharged."

Under this he may be fined, the proceeds going to the county school fund. He may be required also to give bond to obey the injunction even when restitution is not required, as in *The State v. Lindsay,* 85 Kan. 192. Quite naturally it is complained that in this instance the court undertook to impose a fine and divert three-fourths of it to the benefit of the plaintiff. This contention is apparently borne out by the language of the journal entry. There are precedents for this sort of a judgment. In *Merchants' Stock & Grain Co. v. Board of Trade,* 187 Fed. 398, the defendants were adjudged to pay a fine, three-fourths to the complainant and one-fourth to the government. It was there said that the main effect as well as the object of judgment for contempt was—

"To coerce the defendants to obey the injunction and to cease their continuing appropriation of the complainant's property, and the punitive element in it is subordinate, incidental, and so far as the discussion and determination of this question is concerned, negligible." (p. 402.)

In *Kreplik v. Couch Patents Co.,* 190 Fed. 565, the first circuit court of appeals said:

"The court holds that the proper remedial relief for a disobedience of an injunction in the equity cause before it would have been to have imposed a fine for the use of the complainant, measured in some degree by the pecuniary injury caused by the act of disobedience." (p. 569.)

In *Morehouse v. Giant Powder Co.,* 206 Fed. 24, these rulings were referred to with apparent approval. Also in the

case of *In re Independent Publishing Co.*, 228 Fed. 787. In the Gompers case, 221 U. S. 418, the supreme court said:

"But, as the act of disobedience consisted not in refusing to do what had been ordered, but in doing what had been prohibited by the injunction, there could be no coercive imprisonment, and therefore the only relief, if any, which 'the nature of petitioner's case' admitted, was the imposition of a fine, payable to the Buck's Stove & Range Company." (p. 449.)

In *Stollenwerk v. Klevenow*, 151 Wis. 355, attorneys' fees were paid to the plaintiff as a part of the punishment for contempt.

"The employment of attorneys meant assuming an obligation that they be paid for their services. Such employment resulted in loss and damage to the plaintiffs to the extent of the amount they were legally obliged to pay for such services. Such loss was occasioned solely by the contumacious conduct of certain of the defendants. Actual loss and damage was produced and resulted to the plaintiffs by reason of the misconduct of which they complained, . . . and therefore the court was right in awarding indemnity to the plaintiffs." (p. 364.)

High on Injunctions, volume 2, 4th edition, section 1457, says:

"And it is a proper punishment to require a party who has violated an injunction to pay the actual damages which have been sustained by the plaintiff by reason of such violation, with the costs of the proceedings for contempt. But where there had been a clear and willful violation of the injunction, it was held proper to punish by a fine of the amount of the taxed costs and solicitor's and counsel fees incurred by defendant's resistance to the proceedings for attachment and in the proceedings for the taking of testimony as to violation, the defendant to stand committed until payment of such fine. . . . In the federal courts, however, the rule is well established that, in imposing a fine for the violation of an injunction, the court may direct the payment of the money or of a portion thereof to the aggrieved party as compensation for the time and expense involved in procuring the punishment for contempt."

What does the statute mean by providing that the guilty party may be required to make immediate restitution to the party injured? According to Webster's International Dictionary, edition of 1911, "restitution" means:

"Act of restoring; restoration; restoration of anything to its rightful owner; act of making good, or of giving an equivalent for any loss, damage or injury; indemnification."

At common law the word was used to denote the return or restoration of a specific thing or condition, and the writ of

restitution lay to restore after reversal of a judgment what the party had lost. Black gives the definition:

"In equity. Restitution is the restoration of both parties to their original condition (when practicable) upon the rescission of a contract for fraud or similar cause."

The first meaning given by the Oxford English dictionary is:

"The action of restoring or giving back something to its proper owner, or of making reparation to one for loss or injury previously inflicted."

This section of the code is taken from the Ohio code, and we have been unable to find any definition of the word by the courts of that state. Our statute (Gen. Stat. 1915, §10973, subdiv. 2) requires words to be construed according to the context and the approved usage of the language, but technical words which have acquired a peculiar and appropriate meaning in law are to be construed according thereto. The language used is generic in character and does not attempt to specify any subject, kind or instance of restitution, and it is difficult if not impossible to give it any significance if it be restricted to the technical common-law use of the term. If given the ordinary lay meaning, however, the expression would mean that the defendant should make the plaintiff whole for the loss he had occasioned by his violation of the injunction. This seems less strained and unnatural than to attribute to the legislature the technical meaning which leaves the expression as applied to many cases without any practical meaning at all. It may well be said, therefore, and we hold that in an instance like this, in addition to the fine the violator of the injunction may be required to reimburse the plaintiff for the loss sustained by the violation, or at least for her costs in bringing him before the court to answer therefor. It is true that strictly speaking this restitution or reimbursement is no part of a fine, but something in addition thereto, and the language used in the journal entry calling it all a fine is incorrect, $25 of it only being fine and the rest reimbursement; the one going to the county for the use of the schools, the other to the plaintiff; but it would be an excess of nicety to order a reversal on account of this incorrect but unimportant use of the word.

Construing it as we have done, and holding that the judgment was in reality that the defendants pay a fine of $25 and reimburse the plaintiff to the extent of $75, such judgment is affirmed.