Nos. 39,307 and 39,347

EVELYN HENDRIX, *Appellant*, v. CONSOLIDATED VAN LINES, INC., and ELMER SISSON, *Defendants*, AMERICAN AUTOMOBILE INSURANCE COMPANY and ASSOCIATED INDEMNITY COMPANY, *Respondents* and *Appellees*.

(269 P. 2d 435)

Opinion filed April 10, 1954.

C. H. *Morris*, of Wichita, and *Sylvan Bruner*, of Pittsburg, argued the cause, and *Robert F. Bailey, Forest V. McCalley* and *Earl C. Moore*, all of Wichita, and *L. M. Ressler, Don H. Musser* and *Morris Matuska*, all of Pittsburg, and

*Walter B. Patterson,* of Fort Scott, were with them on the briefs for the appellant.

*Homer V. Gooing,* of Wichita, argued the cause, and *Howard T. Fleeson, Wayne·Coulson, Paul R. Kitch, Dale M. Stucky, Donald R. Newkirk, Gerrit H. Wormhoudt* and *Theodore C. Geisert,* all of Wichita, were with him on the briefs for the appellees.

*Daniel M. Moyer,* of Wichita, argued the cause for the defendants.

The opinion of the court was delivered by

PRICE, J.: These consolidated appeals arise out of a proceeding in indirect contempt of court against appellee insurance companies, hereinafter referred to as the Insurance Companies.

One appeal is from an order overruling plaintiff's motion for judgment on the record, and the other is from a final judgment finding such Insurance Companies not guilty of contempt. Because of our disposition of the appeals, and for the further reason that the ruling of the lower court in the first-mentioned appeal is inherent in the other, we will consider them as one and as being an appeal from the judgment finding appellee Insurance Companies not guilty of contempt.

On January 5, 1953, plaintiff (appellant here) filed an action to recover for damage to her automobile and for personal injuries sustained by her as the result of an automobile collision, allegedly caused by the negligence of defendants Consolidated Van Lines, Inc., and one Elmer Sisson.

On February 25, 1953, the defendants answered, and the case was set down for trial by jury for April 29, 1953.

Appellee Insurance Companies were not parties to the damage action, were not insurers of any of the parties, and were not connected with the case in any way except as they were brought into the case by the contempt proceeding.

On April 29, 1953, that being the date the damage action was set for trial, counsel for plaintiff in·that action filed an affidavit and accusation in indirect contempt against the Insurance Companies, and a motion for them to appear and show cause why they should not be adjudged in contempt of court, be restrained from causing certain advertisements to appear in magazines and publications, be directed to publish retractions thereof, and for additional relief.

The accusation alleges that plaintiff's right to a fair and impartial trial by jury, and to a verdict based solely upon the evidence and the law applicable thereto, has been seriously prejudiced as the

result of a series of full page advertisements appearing in Life magazine and The Saturday Evening Post, both publications having nation-wide circulation, and which advertisements were caused to be published therein by the Insurance Companies. Attached to the accusation as exhibits are photostatic copies of the four advertisements in question, two of which were published in Life magazine on January 26, 1953, and March 9, 1953, respectively, and the other two being published in The Saturday Evening Post on February 14, 1953, and March 28, 1953, respectively.

Each of the four full page advertisements contains a photograph occupying more than one-half the page which supplies the background or setting for the printed message in the lower portion of the page.

The picture in the first advertisement shows a guarded closed door of a jury room. The printed message underneath states:

### "YOUR INSURANCE PREMIUM IS BEING DETERMINED NOW

"This could be any courtroom in the country. Behind the locked door, twelve men and women are reaching a verdict involving a defendant protected by a casualty insurance company. What they decide affects your pocketbook.

"All claims against insurance companies have to be paid out of funds created by premiums from policyholders. When these funds are insufficient, insurance rates must be increased.

"Casualty insurance companies have been losing an average of $11 on every $100 of earned automobile liability premiums. More accidents are partly responsible. So are excessive jury awards, rendered by jurors who feel they can afford to be generous with the 'rich' insurance company's money. Actually, jurors who are responsible for awards in excess of what is just and reasonable are soaking *you* by raising insurance rates."

Another one of the advertisements shows a picture of jurors taking the oath, and the printed message underneath the picture reads:

"'. . . A TRUE VERDICT RENDER ACCORDING TO THE LAW AND THE EVIDENCE'

"Jury service is often a difficult responsibility because, when making decisions, we always are tempted to listen to our hearts as well as our heads.

"But the Juror's Oath demands that jurors decide 'according to . . . the evidence.' Jurors sometimes forget this. Ruled by emotion rather than facts, they arrive at unfounded or excessive awards . . . verdicts occasionally even higher than requested!

"These men and women may be scrupulously honest. But as jurors, they feel in their hearts that the injured person—although he may have caused the accident—is entitled to an award.

"Because insurance rates depend on claim costs, these honest jurors cost

millions of policyholders, including themselves, countless extra dollars in premiums every year.

"When you, as a juror, sit in judgment on a suit involving personal injuries, be fair with the public's—and your—money. Reach a decision according to the evidence."

A third advertisement shows the picture of a woman with a puzzled expression at a store counter paying her grocery bill, and this provides the background for the following message appearing underneath:

### "ME? I'M PAYING FOR EXCESSIVE JURY AWARDS?

"Yes, Mrs. Jones, you pay for liability and damage suit verdicts whether you are insured or not.

"For example, higher insurance rates paid by the folks who helped fill your market basket—farmers, processors, truckers, wholesalers and retailers—are reflected in your grocery bill.

"You see, claims against insurance companies are paid out of policyholders' premiums. When jury awards are excessive, all business firms' premiums must be increased.

"And since insurance premiums are part of the over-all cost of doing business, higher premiums must be passed on to you and every other member of the buying public through higher prices.

"Next time you serve on a jury, remember this: When you are overly generous with an insurance company's money, you help increase not only your own premiums, but also the cost of every article and service you buy."

The picture in the fourth advertisement depicts a father "confessing" to his son—a senior in law school—about his recent experience as a juror. The message underneath the picture reads:

### "BILL SET ME STRAIGHT ON JURY AWARDS

"Bill's my son—a senior in law school. Last night I told him about my recent experience as a juror.

"As a businessman, I knew the woman involved in the trial was legally at fault. She walked into a moving car. But she was a widow with a child to support. And I felt certain that the driver of the car was insured.

"The doctor said that the widow wouldn't be able to hold down a steady job for at least a year, so we awarded her a healthy sum. After all, her child must eat.

" 'But the law,' said Bill, 'clearly states that the verdict must be based on legal liability, fault for the accident, as determined by the evidence.'

" 'The insurance company can afford to pay,' I protested.

" 'But claims,' argued Bill, 'must be paid out of premiums belonging to thousands of policyholders—including widows, too. And don't forget, when premium collections do not cover claims, everybody's insurance rates—including yours—have to go up.'

"You know, sometimes it pays to listen . . . even to your son."

In the lower right-hand corner of each advertisement appears the following statement, set off in a sort of box or rectangle:

"Most claims for damages are legitimate and reasonable, and are amicably settled out of court.

"However, as jurors tend more and more to give excessive awards in cases that do go to court, such valuations are regarded as establishing the 'going' rate for the day-to-day out-of-court claims—all of which means increased insurance premium cost to the public."

Also attached to the accusation as exhibits are photostatic copies of sheets or pamphlets which refer to the advertisments above-mentioned, and which, it is alleged, are being distributed by the Insurance Companies to the general public through agents, brokers, community leaders, editors, civic groups and opinion leaders throughout the country. One of such sheets or pamphlets calls attention to the "alarming situation" of excessive jury awards and then goes on to blame jurors.

The accusation then alleges that the objective of such advertising campaign is to bring improper and illegal influences to bear upon prospective jurors; to induce jurors to decide cases not upon the basis of evidence introduced but rather upon the basis of considerations which would constitute a clear violation of the oath of each and every juror; that such advertising campaign is an insidious attempt on the part of the Insurance Companies to undermine and corrupt the sanctity of the jury system and to illegally tamper with the administration of justice, and that it is calculated to persuade prospective jurors either to render inadequate verdicts for injured plaintiffs, or to completely exonerate culpable defendants, despite the evidence and the law applicable thereto, by means of such alleged false, misleading and illegal propaganda.

It is then alleged that the actions and conduct on the part of the Insurance Companies in publishing the advertisements and disseminating the sheets or pamphlets referred to, are illegal and in contempt of court in that they constitute jury tampering and may seriously affect the plaintiff's inalienable right to a trial by an impartial jury, uninfluenced and unprejudiced by personal interest and bias.

The prayer of the accusation seeks an order perpetually restraining and enjoining the Insurance Companies from causing such or similar advertisements and pamphlets to be published or disseminated; that they be required and directed to make public retractions by means of full page advertisements in the two mentioned

magazines, such advertisements to appear in two forthcoming issues of each magazine; that they be adjudged in contempt of court, and that in the damage action between plaintiff and defendants the court instruct the jury substantially in accordance with a requested instruction attached as an exhibit.

Following rulings on motions and other pleadings, not material for our purposes, the Insurance Companies filed an answer which admits the publication of the advertisements and the publication and dissemination of the sheets or pamphlets in question, but denies that such acts were illegal or in contempt of court, and alleges that the publications constitute lawful statements of fact made in pursuance of a lawful and proper purpose. The answer further alleges that the admitted publications constitute a lawful exercise of their right to publish and speak their sentiments on a matter of public interest, such right being guaranteed by the Federal and Kansas Constitutions.

On June 24, 1953, the matter of the contempt action came on for hearing. Plaintiff offered the advertisements and exhibits in evidence and rested. The Insurance Companies admitted the publication of the advertisements, offered no evidence, and rested. The matter was taken under advisement, and on August 20, 1953, the trial court rendered its decision finding the Insurance Companies to be not guilty of indirect contempt of court. From its written decision it appears that the finding of not guilty was made by the court with considerable reluctance, but the court was unable to "conclude that the danger to a fair and impartial trial was made imminent to a high degree."

In denying plaintiff's motion for a rehearing the trial court stated "that during the presentation and decision of the matter it was considered to be an action remedial in nature rather than punitive and in the nature of civil contempt rather than criminal contempt."

Plaintiff has appealed from the judgment finding the Insurance Companies not guilty of indirect contempt and denying her request for remedial relief.

The damage action between plaintiff and defendants has not been tried and is not involved in this appeal. We are concerned only with the contempt proceeding.

At the outset we are confronted with appellee Insurance Companies' motion to dismiss the appeal on the ground that the contempt charged is criminal in nature, not civil, and that no appeal lies from a judgment of not guilty of criminal contempt.

It is further contended that if it should be determined the finding of not guilty is appealable, and irrespective of the nature of the alleged contempt charged, the judgment of the trial court should be affirmed for several reasons.

First, it is contended that the advertisements in question deal with a matter of public interest, are intended to influence public opinion on a public issue, and that they do not pertain to the administration of justice in a particular case, much less to the damage suit filed by plaintiff in the district court of Sedgwick County.

Secondly, it is contended that the published advertisements are within the protection of constitutional guarantees of free speech and press, and authorities are cited in support of the "clear and present danger rule" to the effect that the evil consequences of comment pertaining to the administration of justice must be extremely serious and the "degree of imminence extremely high" before utterances can be punished.

Next, it is argued that other similar proceedings involving these same advertisements have been disposed of favorably to the contentions of appellee Insurance Companies, and they cite *United States v. American Machinery Co.*, 116 F. Supp. 160 (November 6, 1953), and *Hoffman v. Perrucci*, 117 F. Supp. 38 (October 22, 1953), in support thereof.

And finally, it is contended that the injunctive relief sought by plaintiff is not justified and would be improper for the reason that the accusation in contempt shows on its face there is no imminent threat of injury to plaintiff resulting from the advertisements, much less any threat of irreparable injury of the sort which is a condition precedent to the issuance of an injunction, and a number of our decisions to the effect that the remedy of injunction is not used to prevent a prospective injury unless it appears there is a reasonable probability of injury and that the law will not afford an adequate remedy, and that mere apprehension or a possibility of wrong and injury is ordinarily not enough to warrant the granting of an injunction, are relied upon.

Plaintiff, on the other hand, while categorically conceding that a finding of not guilty in a proceeding in criminal contempt is not appealable, contends that as the proceeding in question is remedial in nature, therefore civil contempt, and a finding of not guilty therefore appealable, argues that the publications in question are not within the protection of constitutional guarantees of free speech and press; that they are calculated to influence a large percentage

of prospective jurors throughout the country, including a panel of jurors which would be drawn to sit in judgment on her damage suit in question; that our penal code (G. S. 1949, 21-712) provides that jury tampering is a criminal offense; that under G. S. 1949, 21-1112, untrue, deceptive or misleading assertions, representations or statements in advertisements are branded as a crime; that the orderly administration of justice demands that competent jurors be available at all times; that in the nature of things such a large percentage of the reading public have seen and read the advertisements in question as to create bias and prejudice on the part of any panel of jurors available, and that as a result thereof plaintiff is entitled to the remedial relief sought.

From the foregoing it is obvious that before any discussion as to the merits of this appeal is had there are two questions to decide.

First—Is the contempt charged civil or criminal in nature?

Second—If it is criminal in nature, is the judgment of not guilty appealable?

We take up the questions in that order.

The allegations of the accusation have already been summarized. As stated, plaintiff claims the contempt charged is civil in nature; therefore the finding of not guilty is appealable, and with respect to her specific claim we quote from her brief:

"The appellant asserts that this advertising is an insidious attempt on the part of the appellees to undermine and corrupt the sanctity of the jury system and to illegally and unlawfully tamper with the administration of justice, that by reason thereof appellees are in indirect contempt of court; they are guilty of jury tampering and that such acts and actions interfere with the 'Administration of Justice' in that it seriously affects the appellant's inalienable and constitutional right to a trial by an impartial and uninfluenced jury."

She further argues the proceeding is remedial in nature and therefore civil, for the reason that the trial court, when denying her motion for a rehearing, stated that it considered the action to be remedial and in the nature of civil contempt rather than criminal contempt.

On the other hand, appellee Insurance Companies contend that the specific contempt charged is jury tampering, obstruction of the administration of justice in a general sense, thus rendering the proceeding in the nature of criminal contempt rather than civil, and that the remedial relief sought, such as an injunction against further publication of the same or similar advertisements, and public retractions, is only incidental to the real issue involved.

It is further argued that the process under which they were brought into court empowered the court only to determine whether they had been guilty of contempt of court, and, if so, to prescribe appropriate punishment, and did not empower the court to render an injunctive decree.

The precise distinction between civil and criminal contempt is not always easy to define. Depending upon the facts of the case, a particular contempt may take on some of the qualities and aspects of either.

G. S. 1949, 20-1201, provides:

"That contempts of court are divided into two classes, direct and indirect, and shall be proceeded against only as hereinafter prescribed."

G. S. 1949, 20-1202, provides:

"That contempts committed during the sitting of the court or of a judge at chambers, in its or his presence, are direct contempts. All others are indirect contempts."

Our statutes, however, do not define civil or criminal contempt.

12 Am. Jur., Contempt, § 6, p. 392, reads in part:

"Proceedings for contempt are of two classes—namely, criminal and civil. Criminal contempt proceedings are those brought to preserve the power and vindicate the dignity of the court and to punish for disobedience of its orders. Civil contempt proceedings are those instituted to preserve and enforce the rights of private parties to suits and to compel obedience to orders and decrees made for the benefit of such parties. The former are criminal and punitive in their nature, and the government, the courts, and the people are interested in their prosecution. The latter are civil, remedial, and coercive in their nature, and the parties chiefly interested in their conduct and prosecution are those individuals for the enforcement of whose private rights and remedies the suits were instituted."

17 C. J. S., Contempt, has the following to say on the subject:

"A criminal contempt is conduct that is directed against the dignity and authority of the court, or a judge acting judicially; it is an act obstructing the administration of justice which tends to bring the court into disrepute or disrespect.

"Criminal contempt may arise in the course of a criminal action, in special proceedings, or in civil or private litigation.

"The line of demarcation between acts constituting criminal and those constituting civil contempts is very indistinct. The confusion in attempts to classify civil and criminal contempts is due to the fact that there are contempts in which both elements appear. In general, contempts of court for which punishment is inflicted for the primary purpose of vindicating public authority are denominated criminal, while those in which the enforcement of civil rights and remedies is the ultimate object of the punishment are denominated civil con-

tempts; whether or not a fine or imprisonment is imposed is not a distinguishing test." ( § 5, pp. 7 and 8. )

"Civil contempt consists in failing to do something ordered to be done by a court in a civil action for the benefit of the opposing party therein, and is, therefore, an offense against the party in whose behalf the violated order is made. If, however, the contempt consists in doing a forbidden act, injurious to the opposite party, the contempt may be considered criminal." ( § 6, p. 8. )

"A criminal contempt is an offense against society, while a civil contempt is rather an infringement on the rights of private persons. . . ." ( § 7, p. 8. )

To the same effect see *Holloway v. Water Co.*, 100 Kan. 414, 421, 167 Pac. 265, 2 A. L. R. 161, and *Smith v. Clothier*, 113 Kan. 47, 51, 52, 213 Pac. 1071, in which the distinction between civil and criminal contempt is discussed at length. See also *State, ex rel., v. Miller*, 147 Kan. 242, 75 P. 2d 239.

Here the appellee Insurance Companies are not charged with the disobedience of an order of court previously made for the benefit of an opposing party litigant—the plaintiff. No rights of private parties, in the sense that orders or decrees for their benefit have been made, are involved. No private rights in past litigation are sought to be enforced or vindicated. Despite that that which plaintiff denominates as "remedial relief" is sought, in the over-all picture it is clear that plaintiff's real complaint consists of the charge of jury tampering, which, in turn, obstructs the administration of justice, in a general sense.

Within the definitions laid down in the foregoing authorities we have no difficulty in concluding that the contempt charged here, despite the statement of the trial court to the contrary, but which is not binding on this court, is criminal contempt, rather than civil.

Having concluded that the contempt charged, assuming it to be contempt, is criminal contempt, rather than civil, the next question is whether the judgment of not guilty is appealable.

The question was answered inferentially, if not directly, in the negative, in the case of *Smith v. Clothier*, supra, in which it was specifically held that in a proceeding for civil contempt an appeal may be taken from a judgment finding the defendant not guilty. After discussing the distinction between civil and criminal contempt, and in holding the contempt there charged to be civil, the court went on to say:

"There is some confusion among the authorities concerning the right of appeal or right of review from the judgment of the court in a contempt proceeding. Much of this confusion is eliminated when the questions are classified as to

whether or not the contempt is civil or criminal and as to whether or not the right of review is conferred by statute."   (p. 53.)

Our statute (G. S. 1949, 20-1204), after prescribing procedure to be followed in indirect contempt proceedings, provides that the trial thereof shall proceed upon testimony produced as in criminal cases.   The next section (G. S. 1949, 20-1205) provides:

"That the testimony taken on the trial of any accusation of contempt shall be preserved, and any *judgment of conviction* therefor may be reviewed upon the direct appeal to or by writ of error from the supreme court, and affirmed, reversed, or modified as justice may require. . . ."   (Emphasis supplied.)

Despite the fact the statute does not provide for a review of a finding of not guilty, it was held, as before stated, in *Smith v. Clothier,* supra, that such right of appeal does exist in a civil contempt proceeding.   In arriving at that conclusion the court said:

"In this case a judgment upon the contempt proceedings is 'an order affecting a substantial right, made in a special proceeding or in a summary application in an action after judgment' within the meaning of the term as used in section 566, of the civil code, and is, therefore, 'a final order' from which the aggrieved party may take an appeal within the meaning of that term as used in section 565 of the civil code."   (p. 55.)   (The two sections referred to now appear as G. S. 1949, 60-3303 and 60-3302, respectively.)

Bearing in mind the distinction between civil and criminal contempt, the exception thus made, which allows a review of a finding of not guilty of civil contempt is logical, for, as pointed out, such a finding is a final order affecting a substantial right of an aggrieved party to the action.

Much more on the subject could be written, but time and space do not permit.   We know of no statute or decision of this state, and none has been cited, which authorizes an appeal from a judgment of not guilty in a criminal contempt proceeding.

In conclusion, we therefore hold:  The contempt here charged, assuming it to be contempt, is criminal contempt rather than civil. There is no right of appeal from a judgment of not guilty of criminal contempt.

It therefore follows that the appeal must be and the same is hereby dismissed.

SMITH, J., dissents.