No. 46,588

STATE OF KANSAS, ex rel. KEITH SANBORN, County Attorney, Sedgwick County, Kansas, *Appellant,* v. AL M. BISSING, THE WICHITA GREYHOUND CLUB, et al., *Appellees.*

(502 P. 2d 630)

Opinion filed November 4, 1972.

*Keith Sanborn,* county attorney, argued the cause, and *Vern Miller,* attorney

general, and *Stephen M. Joseph,* county attorney legal intern, were with him on the brief for the appellant.

*W. A. Kahrs,* of Wichita, argued the cause, and *Robert H. Nelson* and *Larry A. Withers,* both of Wichita, were with him on the brief for appellees Al M. Bissing and the Wichita Greyhound Club.

*Benjamin Foster,* of Wichita, argued the cause, and *Herbert H. Hopper* and *Robert S. Fuqua,* both of Wichita, were with him on the brief for appellees James A. Jonkers, Henry D. Rodgers, Leo A. Rasmussen, Sr., and Jack W. Robinson.

The opinion of the court was delivered by

HARMAN, C.: This is a proceeding in indirect contempt of court initiated upon relation of the county attorney of Sedgwick county against Al M. Bissing and four other individuals; Jack W. Robinson, Leo A. Rasmussen, Sr., Henry D. Rodgers and James Jonkers, because of their participation in "doggy bingo". The trial court granted only limited relief and the state has brought the matter here.

The background of the proceeding may be summarized as follows:

In the summer of 1954 Al M. Bissing, the owner of a tract of land adjacent to the city of Wichita (8130 South Broadway), commenced conducting thereon dog races in connection with a system of pari-mutuel betting. Dr. Bissing was also the owner and operator of the Wichita Greyhound Club. The then county attorney of Sedgwick county initiated an action against Bissing and the club wherein the state, relying on the constitutional proscription of lotteries, sought to enjoin further operation of the racing enterprise and to have the premises declared a common nuisance. The trial court ruled that the enterprise did not constitute a lottery and denied the relief requested. On appeal by the state this court reversed, ruling that the activities in question constituted a lottery in violation of the state constitution. The action was remanded for further proceedings in the trial court consistent with this court's decision (*State, ex rel., v. Bissing,* 178 Kan. 111, 283 P. 2d 418).

On June 30, 1955, pursuant to this court's mandate, the district court of Sedgwick county entered a permanent injunction, incorporating this court's judgment, *in personam* against Dr. Bissing, the Wichita Greyhound Club, and all agents, servants and employees of each of them, and *in rem* against the premises, prohibiting use of the premises in connection with a lottery and gambling in the

form of bookmaking, pool selling, betting and wagering on dog races.

The next event to be noticed is enactment by the 1971 legislature of that which is now K. S. A. 1971 Supp. 21-4302, which purported to exclude bingo and other games of chance with comparable characteristics from the definition of a lottery.

During the fall of 1971, Ken's Klub, Inc., a nonprofit Kansas corporation and the holder of a tax exemption certificate under paragraphs 3, 4, 7, 8 and 10 of subsection (c) of section 501 of the internal revenue code of 1954, doing business as The Wichita Kennel Club, entered into a lease with Patricia Bissing, the then owner of the property at 8130 South Broadway, Wichita, for the possession of such premises for the purpose of operating doggy bingo. Leo A. Rasmussen, Sr., Henry D. Rodgers and James Jonkers are all officers of the lessee corporation. Jack W. Robinson was retained by the corporation as its public relations director.

On September 14, 1971, a practice session of doggy bingo was held on the premises in order to test the equipment. Members of various law enforcement agencies were invited to be present; however, no legal proceeding resulted from this activity.

On the night of October 5, 1971, following an intensive advertising campaign by the alleged contemners, the first "live" session of doggy bingo was held. Members of the public were admitted to the premises upon their completion of an application for membership in the Wichita Greyhound Club and payment of one dollar for which they received a membership card valid for that night only and a copy of the rules for doggy bingo. Applications for membership were distributed to the occupants of automobiles as they were lined up on the road leading to the entrance of the premises. The membership fee was collected and the cards and rules were distributed at the entrance.

Standard bingo cards were sold at a price of two dollars each at a booth located on the premises. A lighted bingo board and a small glass box containing numbered ping-pong balls were situated on a raised platform. A person withdrew balls from the box one at a time and announced the successive numbers to the purchasers of the bingo cards. Doggy bingo was played in the following manner: At the top of each bingo card the letters B,I,N,G,O appear. Under each letter are five numbers so that each card contains a block of twenty-five numbers. No cards contain exactly the same numbers. As the operator of the game draws numbers by chance

and announces them, each player blocks out that number if it appears on a card held by him.

In ordinary bingo any player who by reason of numbers drawn blocks out a line of five numbers either vertically, horizontally or diagonally on his card has a "bingo" and is entitled to the prize. Doggy bingo operates somewhat differently in that to bingo it is necessary to have five numbers blocked out vertically and the game continues and numbers are drawn until someone has a bingo under each of the five letters on the cards. Each person thus favored by Dame Fortune is entitled to a monetary prize and in addition, as a holder of one of the letters, is entitled to participate in the ensuing dog race. At the conclusion of each bingo game five greyhound dogs are brought to the race track. Each dog wears one of five letters: B,I,N,G or O. A mechanical rabbit is started on the track, which device the dogs chase around the track to a finish line. The dog first crossing the line is declared the winner. Each participant who completes a vertical bingo is paid a cash prize without regard to where his dog finishes in the race. The bingo winner holding the card with the letter of the winning canine is paid an additional sum. Prize money is derived from the money received at the gate from memberships and from the sale of bingo cards. The activity was conducted in this manner five times during the night of October 5, 1971. At the end of each race new bingo cards were sold, bingo was again played and another race run. Ken's Klub had previously made arrangements with Dr. Bissing to conduct the greyhound races upon its behalf and he was generally in charge of the activities on the premises on the night in question.

That same night an affidavit in contempt was filed in the trial court, setting out alleged violations of the permanent injunction previously issued against Bissing, the Wichita Greyhound Club and the particular property. After an evidentiary hearing at which the foregoing facts were substantially developed the trial court issued an order directing the sheriff of Sedgwick county to seize the gambling paraphernalia used on the premises along with a show cause order directed to the individual defendants as to why they should not be cited and punished for contempt. Pursuant to the seizure order the sheriff took possession of certain bingo equipment described as a jet action bingo blower, flashboard, hard cards, usher apron, colored ping-pong balls, cardboard markers, bingo case with set of balls and master board, and green bingo cards.

Eventually the five individuals heretofore named were accused in contempt with willful violation of the permanent injunction issued in *State, ex rel., v. Bissing,* supra, the accusation detailing the activities conducted on the premises in question. Issues were joined by the filing of answers and hearing was had thereon. The alleged contemners made certain admissions as to the facts, and oral testimony and a mass of exhibits were offered by the state and received in evidence.

At the conclusion of the hearing October 29, 1971, the trial court announced its ruling in the following colloquy:

"THE COURT: As I understand this particular contempt action, it grew out of a condition wherein certain citizens of our community were trying to ascertain whether or not doggie bingo, involving the racing of dogs, was legalized under Chapter 111 of the 1971 Session Laws. I agree that there was no intentional vicious contemptuous action on the part of these people to violate an injunction that was issued by this court back in 1955. Also, the state, instead of proceeding against these individuals in a criminal matter, saw fit to file contempt citations. I feel everybody concerned in this matter has tried to place the question before the court fairly and squarely as to whether the so-called doggie bingo is in violation of Chapter 111. As the court understands Chapter 111 the legislature attempted to legalize bingo under certain conditions and added to that a game of chance with comparable characteristics.

"The facts before us show us that we had a bingo game and that out of the bingo game certain winners became eligible for additional prizes to be determined by the racing of dogs, and, as I understand it, that the bingo was played until someone had completed the vertical line under each of the five letters, and upon the completion of the fifth line these five winners were given a dog in a five-dog race and that, for example, if the winner of 'i' had the dog that had 'i' on it won the race, that the winner of the bingo card holding 'i' on the 'i' column won the pot. To me that is not a game of chance with comparable characteristics. Therefore, it is the opinion of the court that we do have a violation of Chapter 111, and, therefore, also a violation of the injunction heretofore entered by this court.

"The injunction that was entered back in 1955 said, 'The defendants, and each of them, are hereby permanently restrained and enjoined from conducting a lottery and gambling in the form of bookmaking, pool selling, betting and wagering upon the premises above described upon dog races,' et cetera. The defendants in that case were Al M. Bissing and the Wichita Greyhound Club, and all agents, servants and employees of each of them.

"The court is of the opinion that with reference to Mr. Rasmussen and Mr. Rodgers that there is no evidence here to find them guilty of contempt of that order. With reference to Senator Robinson and Mr. Jonkers the court is of the opinion that they are not included within the words 'agents, servants and employees.' Therefore, the court is going to find Mr. Jonkers and Senator Robinson, Mr. Rodgers and Mr. Rasmussen not guilty of contempt of the injunction.

"With reference to Dr. Bissing the court is going to find Dr. Bissing guilty of contempt of this court in violating the injunction of 1955. The court is going to assess, in view of everything I have said, Dr. Bissing to pay a fine of twenty-five dollars.

"With reference to the equipment that is in the custody of the sheriff the court will order that to be returned to the owners.

. . . . . . . . . . . . .

"Mr. Sanborn: Are you going to tax the costs, Your Honor?

"The Court: No, I'm not going to tax the costs.

"Mr. Sanborn: We move the court tax the costs against the defendant in these proceedings.

. . . . . . . . . . . .

"The Court: I'm not going to tax the costs."

The state immediately announced its intention to appeal and thereafter filed notice of appeal to this court. No cross-appeal was taken by appellee Bissing. Meanwhile, the trial court, upon the state's request, granted a ten day stay of execution of its order directing return of the seized paraphernalia to appellees and its order dissolving an interim order made October 11, 1971, directing that the financial status quo with respect to the doggy bingo operation be maintained. This stay order was granted to permit application to be made to this court for similar relief, which application was made and sustained November 9, 1971, with the result the trial court's stay order was extended until further order of this court.

As indicated, the state has appealed, specifying as error (1) the trial court's failure to sustain the state's motion asking summarily for judgment against all alleged contemners on the basis of the admissions contained in their answers and in the factual stipulation made in open court; (2) failure upon full hearing to find the four individuals guilty of contempt; (3) refusal to tax costs including reasonable attorney fees; (4) ordering return of the seized paraphernalia; and (5) inadequacy of the fine imposed upon Dr. Bissing. The state also urges that in the exercise of its superintending power this court by way of quo warranto should oust contemners from the exercise of the corporate power of operating doggy bingo under the charter of Ken's Klub, Inc., and by way of mandamus should grant all relief requested.

Appellees Robinson, Rasmussen, Rodgers and Jonkers raise the threshold issue that in a criminal contempt proceeding an appeal may not be taken from a finding of not guilty and indeed this court has so held. *Hendrix v. Consolidated Van Lines, Inc.,* 176 Kan. 101, 269 P. 2d 435, was such a proceeding brought against certain insur-

ance companies by reason of their publication of advertisements allegedly designed to affect the right to fair trial by jury. The court's ruling was summarized thus:

"In a general way, civil contempt is defined as being the failure to do something ordered by a court to be done for the benefit or advantage of another party to the proceeding, that is, disobedience of a court order or decree made in behalf of a litigant. A proceeding in civil contempt ordinarily is remedial and coercive in nature, and is brought for the enforcement of private rights and remedies.

"In a general way, criminal contempt is defined as being conduct which is in disrespect of a court or its processes, or which obstructs the administration of justice.

"In a civil contempt proceeding an appeal may be taken from a judgment of not guilty as well as from a judgment of guilty.

"In a criminal contempt proceeding an appeal may be taken from a judgment of guilty, but not from a judgment of not guilty." (Syl. ¶¶ 1, 2, 3, and 4.)

The foregoing rules were subsequently recognized, albeit by way of dictum, in *Roush v. Hodge*, 193 Kan. 473, 394 P. 2d 101.

It is clear that the alleged contempt in the case at bar is criminal contempt—appellant does not contend otherwise. Appellant does assert as authority for its position that an appeal lies in a situation as here presented this court's decision in *State, ex rel., v. Ramsey*, 151 Kan. 764, 100 P. 2d 637. That was an appeal from a judgment sustaining defendants' demurrer to the evidence in a proceeding for contemptuous violation of an injunction against certain premises which had been judicially declared a common nuisance because of illegal gambling and liquor sales conducted thereon. The trial court's ruling absolving the alleged contemners was premised on the fact there was no showing they had knowledge of the injunction alleged to have been violated. On appeal by the state this court reversed, holding that an injunctive decree prohibiting gambling or liquor law violations on particular premises is "an encumbrance which runs with the land, of which everybody must take notice". (p. 767.)

The state urges the posture of *Hendrix* is sufficiently distinguishable from that in *Ramsey* that the latter should control. The principal distinction relied upon is that the ruling appealed from in *Ramsey* was based on an erroneous interpretation of law while in *Hendrix* the dispute did not concern the law but rather application of the facts to the law. Also pointed out is that in *Ramsey* the contempt proceeding was brought to enforce an *in rem* injunction against a common nuisance while in *Hendrix* the contempt pro-

ceeding was initiated within the context of a civil suit for damages.

It is noteworthy the issue of appealability was never raised nor considered in *Ramsey.* In *Hendrix* this statement appears:

"We know of no statute or decision of this state, and none has been cited, which authorizes an appeal from a judgment of not guilty in a criminal contempt proceeding." (p. 111.)

Upon reexamination we are satisfied with the soundness of the rule stated in *Hendrix,* which appears to be that applied in the majority of jurisdictions where the issue has been considered (see anno. 24 ALR 3d 650, 654). Additionally, under the particular circumstances of the case at bar, we would decline by extraordinary writ to assume jurisdiction as urged by appellant. By way of further defense these four appellees have asserted the legality of their doggy bingo enterprise by virtue of K. S. A. 1971 Supp. 21-4302, the constitutionality of which had not yet been determined when this action was heard. That issue has now been considered and settled in *State v. Nelson,* 210 Kan. 439, 502 P. 2d 841, so there is no occasion for the utilization of any extraordinary authority to settle an important public question or to prevent general circumvention of the constitutional prohibition of lotteries as asserted by appellant. This disposes of the appeal with respect to the four individuals not parties to the original injunction suit, excepting only the seized paraphernalia to be mentioned later.

Appellee Bissing asserts the state did not appeal from the judgment rendered against him and that the fine which was assessed against him has been paid and therefore all points raised by appellant as to him are moot. His argument is, there was no allegation in the notice of appeal referring to him. Also, as supportive, he points to the following statement contained in appellant's brief:

"From all of the above rulings, save the conviction of Bissing, the State appeals."

This assertion lacks merit. The notice of appeal was directed to and served upon appellee Bissing; it pointed out that the trial court's ruling allowed contemners to profit by their own wrongdoing and, more specifically, requested that a fine more appropriate to the offense be levied and that the costs of the proceeding, including reasonable attorney fees, be taxed against contemners. Although not the most skillfully drawn we think the notice of appeal suffi-

ciently identified the judgment and the part thereof asserted to be erroneous. Certainly the appeal was not from the judgment of conviction, rather it was from certain aspects of the penalty imposed including the failure to tax costs and to impound the articles allegedly used in gambling.

The assertion of mootness may be quickly disposed of. Generally, an issue is moot when a judgment of the appellate court would be of no consequence (*Diehn v. Penner*, 169 Kan. 63, 216 P. 2d 815). A ruling by this court on the issues raised as to appellee Bissing would have practical consequences; hence those issues are not moot.

We treat first with appellant's contention the twenty-five dollar fine was so inadequate as to amount to arbitrary action inasmuch as it allowed appellee Bissing (and the other alleged contemners) to realize a profit from wrongful conduct. The record by no means supports this latter conclusion; however, the crux of the matter is that the degree of punishment for criminal contempt rests in the sound discretion of the trial court (see 17 Am. Jur. 2d, Contempt, § 105) which discretion will not be reviewed or revised on appeal except for abuse. Nothing in the record suggests partiality, prejudice or corrupt motive in the assessment of the fine and the appeal is not sustained on the grounds of its inadequacy.

Appellant also complains the trial court erred in failing to tax the costs, including attorney fees for the prosecuting attorney, against appellee Bissing after finding him guilty of criminal contempt. As to this we must agree.

Our former statutory proceedings for abatement of nuisances resulting from prohibited activity are now encompassed in K. S. A. 1971 Supp. Chapter 22, Article 39, effective July 1, 1970. 22-3901 prescribes the scope of the activities declared to be common nuisances when used in connection with real and personal property; proscribed activities include commercial gambling and possession of gambling devices. Property used in connection with these activities is made subject to injunction and abatement. 22-3902 and 22-3903 provide a procedure for abatement. 22-3904 deals with the types of final judgments which may be entered in nuisance proceedings. Subsection (3) provides:

"Upon final judgment for the state the court shall adjudge that the defendant pay all costs, including a reasonable fee, to be fixed by the court, to be paid to the prosecuting attorney. Such costs shall be a lien upon any real property against which an order of abatement is obtained."

The property in question was already subject to a final injunctive

order. Appellee Bissing was likewise subject to that order and has now been finally adjudged guilty of contempt of that order. An action for contempt grounded on violation of an injunction is not a separate independent action but is a part of the original injunction suit (*Frey v. Willey*, 161 Kan. 196, 166 P. 2d 659).

The impact of this rule on the precise question under consideration was dealt with many years ago in *State v. Plamondon*, 75 Kan. 269, 89 Pac. 23. There the accused was convicted of contempt of court upon his violation of an order enjoining the maintenance of a liquor nuisance on particular property. At issue was the authority of the trial court to award a reasonable fee to the prosecuting attorney as a part of the costs taxed against the contemner. In upholding such authority this court stated:

"The right of the court to give judgment for an attorney's fee is also questioned. The statute expressly authorizes an award for attorney's fees in a suit for abating and enjoining a nuisance. . . . A like statute has been held to justify an allowance of an attorney's fee as a part of the costs in a proceeding for contempt which is incidental to a suit for an injunction. (*The State, ex rel., v. Durein*, 46 Kan. 695, 27 Pac. 148.) It is argued that the statute referred to provides only for an award of attorney's fees in suits for injunctions, but does not cover proceedings for contempt. The proceeding for contempt, although criminal in its nature, is an incident to, and one of the final steps in, the suit for an injunction. It was remarked by Mr. Justice Porter, in the recent case of *The State v. Thomas*, 74 Kan. 360, 86 Pac. 499, that 'the proceeding is a part of the original case and the court properly took judicial notice of the previous order granted in that case.'" (p. 272.)

Although on its face 22-3904 (3) pertains only to actions for abatement of a common nuisance by way of injunction, such a statute must be held to apply with equal force to contempt actions for violation of an injunction so. obtained. It mandates that the defendant pay all costs, including a reasonable attorney fee to be fixed by the trial court. Hence we conclude the trial court erred in this omission. It is no answer, as suggested by appellee, that the issue of attorney fees was not specifically raised in the trial court. Attorney fees when allowable are taxed as a part of the costs and here the prosecuting attorney was effectively foreclosed by the trial court on the cost aspect of the judgment before reaching the elements involved.

Finally, appellant urges error in the trial court's order directing return to appellees of the gambling paraphernalia seized. The trial court did in effect find that the seized property was being used for an unlawful purpose. That property fully qualifies as "gambling

devices" as defined in K. S. A. 1971 Supp. 21-4302 (4). In its comment accompanying this annotated section the Judicial Council notes "this definition includes not only mechanical and electronic devices but lottery tickets, numbers slips, and other evidence of participation in gambling enterprises." (p. 381.) K. S. A. 1971 Supp. 22-3904 (2) authorizes the district court to order public destruction of any paraphernalia designed for and used in carrying on any of the unlawful activities mentioned in 22-3901, but this authority is couched in permissive terms and no specific standard is prescribed for its exercise. Enacted at the same time as 22-3904 and *in pari materia* as relating to the same subject matter is K. S. A. 1971 Supp. 22-2512, providing for the custody and disposition of property validly seized by an officer. Subsection (4) states:

"(4) Articles of contraband *shall* be destroyed, except that any such articles which may be capable of innocent use may in the discretion of the court be sold and the proceeds disposed of as provided in subsection (2). . . ." (Emphasis supplied.)

In *Campbell American Legion v. Wade*, 210 Kan. 537, 502 P. 2d 773, this court emphasized the interest of the state of Kansas in gambling property seized as contraband under 22-2512. This interest derives, of course, from the policy plainly expressed in the unqualified constitutional proscription of lotteries (Kan. Const., Art. 15, § 3). The undoubted purpose of the legislative enactments, with respect to gambling, is to eliminate effectively the use of personal property in connection with lotteries or gambling. Hence we conclude, to accomplish that purpose, disposition of the seized property should be that mandated by 22-2512 (4). The record does not disclose ownership of the property. On oral argument it was stated to be in one of the four individual appellees as to whom this appeal is dismissed. The proceeding nonetheless is one *in rem* as to the property, making it subject to the disposition directed.

The appeal relating to appellees Robinson, Rasmussen, Rodgers and Jonkers is dismissed. As to appellee Bissing the judgment respecting the fine imposed is affirmed; that relating to taxation of costs including attorney fees for services in the trial court and to disposition of the seized property is reversed and the cause is remanded for further proceedings in accordance with this opinion. This court's stay order of November 9, 1971, is set aside, effective upon receipt of the mandate herein.

APPROVED BY THE COURT.